MOVIE MANIA METRO, INC v GZ DVD'S INC

Docket No. 311723. Submitted December 4, 2013, at Detroit. Decided
September 9, 2014, at 9:15 a.m.

Movie Mania Metro, Inc., brought an action in the Macomb Circuit
Court against GZ DVD's Inc., Hazim Jarbo, and Sandra A. Zielke,
alleging (1) trademark infringement under the common law; the
Michigan trademark act, MCL 429.31 *et seq.*; and the Lanham Act,
15 USC 1051 *et seq.*, and (2) trademark dilution under the Lanham
Act. Plaintiff operated a video-rental business in the Detroit area
and used the trademark "Movie Mania" in connection with its
stores. Thereafter, plaintiff engaged in naked licensing of the
"Movie Mania" mark, which is the practice of allowing others to
use a mark without exercising reasonable control over the nature
and quality of the goods, services, or business on which the
licensees use the mark. While plaintiff had originally registered
the mark with the state, the registration expired in 2006. By 2007,
six stores bearing the mark operated in the Detroit area, but
plaintiff owned only two of them. In 2010, an unaffiliated licensee
closed a Movie Mania location and sold his business assets to
defendants. Defendants contacted plaintiff for permission to con-
tinue the use of the "Movie Mania" mark, but plaintiff demanded
a fee and a licensing agreement. Defendants instead opened a
video-rental store bearing the "Movie Mania" mark near the
closed store. In January 2011, plaintiff demanded that defendants
cease using the mark, after which plaintiff registered the mark
again in April 2011. Following discovery in the lawsuit, defendants
moved for summary disposition, asserting that plaintiff had aban-
doned the "Movie Mania" mark by (1) failing to renew the mark in
2006, (2) allowing other parties to use the mark without supervi-
sion, fees, or standards, and (3) generally failing to protect the
mark as a source identifier. The court, Richard L. Caretti, J.,
granted the motion, concluding that plaintiff's trademark-
infringement arguments were precluded because it had engaged in
naked licensing from 1999 to 2005 and therefore had abandoned
the mark before defendants used it. The court also rejected
plaintiff's argument that defendants' activities constituted trade-
mark dilution under the Lanham Act because the "Movie Mania"
mark was not a famous mark. Plaintiff appealed.

The Court of Appeals *held*:

The Lanham Act provides that naked licensing constitutes abandonment of a trademark. Therefore, trademark holders that engage in naked licensing relinquish all rights to the mark. The Michigan trademark act does not provide that naked licensing constitutes abandonment of a trademark and instead defines abandonment as being the nonuse or implied nonuse of a trademark. Accordingly, a mark holder that engages in naked licensing of its trademark abandons the trademark under the Lanham Act but not under the Michigan act. Nevertheless, a mark holder that engages in naked licensing cannot sustain a trademark-infringement claim under the Michigan act or at common law because the naked licensing of a mark renders it not valid as a trademark.

1. A party alleging a trademark violation under the Lanham Act may litigate the action in state court. Plaintiff, however, abandoned its argument on appeal that the trial court erred by granting summary disposition to defendants on the federal claims when it discussed only naked licensing and the concept of trademark abandonment under Michigan law in its brief and failed to discuss the relevant legal standards necessary to establish trademark infringement and trademark dilution under federal law. Regardless, plaintiff's federal claims lacked merit.

2. Plaintiff's claim of trademark dilution was frivolous. Under 15 USC 1125(c)(1), only owners of a famous mark can prevail on a dilution claim. According to 15 USC 1125(c)(2)(A), a mark is famous if it is widely recognized by the general consuming public of the United States as a designation of the source of the goods or services of the mark's owner, which plaintiff's mark was not.

3. The trial court also correctly granted defendants summary disposition on plaintiff's claim of trademark infringement under the Lanham Act because plaintiff abandoned the "Movie Mania" mark under 15 USC 1127 when it engaged in naked licensing. When other businesses use the mark that is the subject of naked licensing, consumers are unable to use the mark to distinguish goods and services bearing the mark as originating exclusively from the mark holder. Because naked licensing destroys a mark's ability to serve as a source identifier for consumers, state courts held at common law that plaintiffs that engaged in naked licensing could not prevail in trademark-infringement actions because the mark was not distinctive and accordingly not a valid trademark protectable under trademark law. 15 USC 1127, on the other hand, deems naked licensing to be abandonment of a trademark, which is effectively the same as rendering the mark not valid. To avoid

abandonment, a trademark holder that licenses its mark to third parties must retain control of the mark, which could include supervision of the licensee's operations, store layout, advertising, sales and merchandising, or other incidences of business. The "Movie Mania" mark could not have served to consumers as an indication of consistent and predictable quality because several businesses used the "Movie Mania" name and had no uniform standard of control or quality between them.

4. The trial court incorrectly held that naked licensing of a mark constitutes abandonment of that mark under the Michigan trademark act. MCL 429.31(i) states that a mark is abandoned when its use has been discontinued with intent not to resume the use. During the time relevant to this litigation, plaintiff continuously operated a video-rental business bearing the "Movie Mania" mark. Accordingly, plaintiff never abandoned the mark under the Michigan trademark act because plaintiff never discontinued the mark's use. Engaging in naked licensing is irrelevant for purposes of abandonment under the trademark act because the act does not recognize that naked licensing constitutes abandonment.

5. The trial court, however, ultimately reached the correct result under the Michigan trademark act (that defendants were not liable for trademark infringement), because naked licensing of a mark destroys the mark's validity and therefore renders the mark not protectable as a trademark under Michigan law. Plaintiff's underlying claim was for trademark infringement. A plaintiff that claims infringement under MCL 429.42 must show (1) that the mark the plaintiff claims to hold is valid, that is, it actually functions as a trademark, (2) that the plaintiff holds priority in the mark, that is, the plaintiff used the mark before the defendant, (3) that consumers are likely to confuse the defendant's mark with the plaintiff's mark, and (4) that the defendant used the allegedly infringing mark. Under the Michigan trademark act and at common law, trademarks are valid when they are (1) used in connection with the sale and advertising of products or services and (2) distinctive in that consumers understand the mark to designate goods or services as the product of a particular manufacturer or trader. Therefore, to be distinctive and consequently a valid trademark, the trademark must serve as a source identifier to consumers. Plaintiff's naked licensing of the "Movie Mania" mark to other video-rental business operators destroyed whatever distinctiveness "Movie Mania" possessed. The mark was therefore not valid and not entitled to protection under the trademark act.

Affirmed.

1. INTELLECTUAL PROPERTY — TRADEMARKS — INFRINGEMENT LITIGATION — FEDERAL LANHAM ACT — JURISDICTION — STATE COURTS.

A party alleging a trademark violation under the Lanham Act, 15 USC 1051 *et seq.*, may litigate the action in a state court.

2. INTELLECTUAL PROPERTY — TRADEMARKS — INFRINGEMENT LITIGATION — NAKED LICENSING — FEDERAL LANHAM ACT — MICHIGAN TRADEMARK ACT — ABANDONMENT OF TRADEMARKS — INVALID TRADEMARKS.

Naked licensing of a trademark is the practice of allowing others to use the mark without exercising reasonable control over the nature and quality of the goods, services, or business on which the licensees use the mark; under 15 USC 1127, part of the Lanham Act, 15 USC 1051 *et seq.*, naked licensing constitutes abandonment of a trademark and trademark holders that engage in naked licensing relinquish all rights to the mark, precluding a trademark-infringement under that act; engaging in naked licensing does not constitute abandonment of the mark under the Michigan trademark act, MCL 429.31 *et seq.*, but naked licensing precludes a trademark-infringement claim under that act or at common law because the naked licensing of a mark destroys its distinctiveness and renders it not valid as a trademark.

*Aubrey H. Tobin, Attorney at Law, PC* (by *Aubrey H. Tobin*), for plaintiff.

*Kim Corbin, PLLC* (by *Kim Corbin*), for defendants.

Before: METER, P.J., and CAVANAGH and SAAD, JJ.

SAAD, J. Plaintiff appeals the trial court's order that granted summary disposition to defendants. For the reasons stated below, we affirm.

## I. NATURE OF THE CASE

This case is a claim for trademark infringement. As our Court recently explained in *Janet Travis, Inc v Preka Holdings, LLC*, Michigan law has offered protection of trademark rights for the benefit of

business owners, and the consuming public. Business owners, who invest significant amounts of money and effort to

> convince consumers to identify their marks with their products and services, needed a remedy against competitors who sought to free ride on this accumulated goodwill by copying or pirating already established marks. Consumers, who associated and expected a certain level of service and quality with certain marks, needed protection from imposters who copied or pirated already established marks to "pass off" their goods and services as those of the business associated with the marks. [*Janet Travis, Inc v Preka Holdings, LLC*, 306 Mich App 266, 267-268; 856 NW2d 206 (2014) (citation omitted).]

Trademark law, therefore, involves "the advancement of two distinct but related interests: the private right of the trademark holder to prevent others from using its mark to pass off the others' goods or services as the trademark holders, and the public right to protection from this deceptive practice." *Travis*, 306 Mich App at 268.

Because the right of a trademark holder to its trademark is a by-product of these two interests, trademark rights are a special kind of intellectual property in that the mark holder's right to exclusive use of its mark is tempered by and dependent on the perceptions of the consuming public. For a mark to serve as a trademark and be entitled to legal protection, the consuming public must be able to use the mark to "distinguish a good as originating from a particular source."[1] If the consuming public is unable to use the mark to distinguish a good as originating from a particular source, the mark does not function as a trademark and is thus not entitled to legal protection. Trademark rights are thus inherently mutable because they are dependent on whether the consuming public is able to use the mark to distinguish a good or service as originating from a particular source.

---

[1] *Travis*, 306 Mich App at 281, citing MCL 429.32(e).

Consumer perception of a mark can be shaped by many factors, including the actions of the mark holder. Normally, as in *Travis*, the mark holder realizes the valuable nature of its trademark and will thus make every effort to ensure that, in the minds of consumers, the mark remains associated with the mark holder's products and services, and the mark holder's products and services alone. But on occasion, as here, a mark holder, through its own actions or omissions, destroys the value of the trademark by severing the link in the mind of the consumer between the mark holder's mark and the particular product or service. In other words, a mark holder's actions can cause its mark to no longer function as a trademark, and thus not be entitled to legal protection.

One common way that a mark holder may engage in this mark-destroying process is "naked licensing," or the practice of "allowing others to use [its] mark without exercising 'reasonable control over the nature and quality of the goods, services, or business on which the [mark] is used by the licensee'."[2] If other businesses are using the mark holder's mark, and operate independently and with little to no oversight from the mark holder, consumers will be unable to use the mark to distinguish goods and services bearing the mark as originating exclusively from the mark holder. In other words, a mark that is the subject of naked licensing can no longer function as a trademark and is accordingly not the proper subject of legal protection. In the parlance of trademark law, naked licensing destroys a mark's "distinctiveness" and renders it "not valid"[3] as a trademark.

---

[2] *Eva's Bridal Ltd v Halanick Enterprises, Inc*, 639 F3d 788, 789 (CA 7, 2011) (Easterbrook, C.J.) (citation omitted) (second alteration in original).

[3] "Not valid" is a term of art in trademark law that refers to a trademark's lack of "validity." A "valid" trademark is one that is properly

Because this practice prevents consumers from being able to use the mark to identify goods and services as the products of a specific business, courts have refused to protect marks that are subject to naked licensing at common law, under Michigan law, and under federal law. Initially, both state and federal courts did so by holding that nakedly licensed marks were not valid trademarks and thus not properly protectable under trademark law. After revisions to the federal Lanham Act[4] in 1988, however, most federal decisions now hold that nakedly licensed trademarks have been "abandoned," while state courts continue to hold, under statutory and common law, that nakedly licensed trademarks are not valid.

This case requires us to make this doctrinal distinction between state and federal law. The Lanham Act explicitly states that naked licensing constitutes "abandonment" of a trademark, in that trademark holders who engage in naked licensing relinquish all rights to their mark.[5] The Michigan trademark and service mark act (Trademark Act)[6] does not state that naked licensing constitutes abandonment of a trademark and instead defines abandonment to mean mere nonuse, or implied nonuse, of the trademark.[7] Accordingly, a mark holder that engages in naked licensing of its trademark "abandons" the trademark under the Lanham Act, but does *not* "abandon" the trademark under the Trade-

---

the subject of trademark law—i.e., is protectable under trademark law. See *Abercrombie & Fitch Co v Hunting World, Inc*, 537 F2d 4, 9 (CA 2, 1976) (Friendly, J.). In this opinion, we use the terms "not valid" and "invalid" interchangeably to refer to a mark's lack of validity.

[4] 15 USC 1051 *et seq*.

[5] 15 USC 1127.

[6] MCL 429.31 *et seq*.

[7] MCL 429.31(i) states that "a mark is 'abandoned' when its use has been discontinued with intent not to resume."

mark Act. Nevertheless, a mark holder that engages in naked licensing is not able to sustain a trademark-infringement claim under the Trademark Act or at common law because the naked licensing of a mark renders that mark not valid as a trademark.

Plaintiff is a mark holder that engaged in naked licensing of its mark, "Movie Mania," for more than five years with multiple parties. It nonetheless sued defendants, who used the "Movie Mania" mark a decade after the first instance of plaintiff's naked licensing, for trademark infringement, under both the Lanham Act and the Trademark Act. The trial court granted defendants' request for summary disposition on the theory that plaintiff's naked licensing constituted abandonment of the "Movie Mania" mark under both the Lanham Act and the Trademark Act.

We affirm this decision, but the trial court reached the right result for the wrong reasons. Naked licensing constitutes abandonment under the Lanham Act, but it does not constitute abandonment under the Trademark Act's more narrow definition of that term. Even so, plaintiff's action for infringement fails because its naked licensing of "Movie Mania" has made the mark not valid, and defendants' use of the mark does not make it liable for trademark infringement under the Trademark Act.

We therefore reject plaintiff's arguments on appeal and affirm the order of the trial court.

## II. FACTS AND PROCEDURAL HISTORY

Plaintiff operated a video-rental business in metro Detroit, and began using the name "Movie Mania" in commerce in 1989. It subsequently registered the "Movie Mania" mark with the appropriate Michigan department in 1996. Thereafter, plaintiff acted as a

promiscuous licensor and allowed various unaffiliated parties in the Detroit area to use the "Movie Mania" mark in conjunction with those parties' video-rental businesses.

This lawsuit is the product of a series of such licensing transactions, which began in 1999. In that year, plaintiff sold one of its Movie Mania locations to another company, CLD, Inc, which sought to continue the store's video-rental business. Plaintiff allowed CLD to continue to use the "Movie Mania" mark for $1 in annual royalties. Yet the licensing agreement placed almost no restrictions on the use of the mark, nor did it contain standards on advertising or store operations, or include any requirements related to the rental or sale of merchandise at the CLD-owned Movie Mania.

CLD sold its Movie Mania store to Adnan Samona in 2005. Samona contacted plaintiff and asked permission to continue use of the "Movie Mania" mark, which plaintiff granted. Plaintiff did not require Samona to sign a licensing agreement or pay any royalty fee in return for use of the mark. Nor did plaintiff object or contact Samona as he expanded his business in 2006 and 2007, purchasing another, unaffiliated video-rental store and changing its name to "Movie Mania."[8] Again, as in its dealings with CLD, plaintiff provided Samona with almost no restrictions on the use of the mark, nor did it set standards on advertising or store operations or outline requirements related to the rental or sale of merchandise at the Samona-owned Movie Mania.

---

[8] Plaintiff's lack of proprietary regard for the mark extended to its registration, which expired in 2006. See MCL 429.38(a) (providing that registered marks that are more than 10 years old and not renewed are canceled from the register). Nonetheless, the licensed (and unlicensed) use of the "Movie Mania" mark continued unabated: by the end of Samona's expansion in 2007, six stores bearing the mark operated in metro Detroit. Plaintiff owned only two of the locations.

In 2010, Samona closed his St. Clair Shores Movie Mania location and sold its business assets to defendants. As Samona had done in 2005 when he purchased CLD's Movie Mania store, defendant Sandra A. Zielke contacted plaintiff to ask permission to continue use of the "Movie Mania" mark. One of plaintiff's officers told Zielke that defendants could not use the mark unless they paid a fee and signed a licensing agreement. Defendants did not acquiesce to plaintiff's request and opened a video-rental store bearing the "Movie Mania" mark one block away from Samona's original location. In January 2011, plaintiff told defendants that "Movie Mania" was a registered Michigan service mark (actually, it was not—as noted, its registration expired in 2006 because plaintiff failed to renew the registration) and demanded that defendants cease and desist use of the mark. Plaintiff did not reregister the "Movie Mania" mark until an even later date, April 18, 2011, which further demonstrates that it places little value in its mark.

Plaintiff then initiated this action against defendants in the Macomb Circuit Court and alleged, among other things, (1) trademark infringement under the common law, the Trademark Act, and the Lanham Act and (2) trademark dilution under the Lanham Act. After discovery, defendants moved for summary disposition under MCR 2.116(C)(10) because plaintiff had abandoned the "Movie Mania" mark when it (1) failed to renew the mark in 2006, (2) allowed other parties to use the mark without supervision, fees, or standards, and (3) generally failed to protect the mark as a source identifier.

The trial court granted defendants' motion for summary disposition of plaintiff's claims. In a written opinion, it found that plaintiff's trademark-infringement arguments (under the common law, Trademark Act, and the Lanham Act) were precluded

because plaintiff engaged in naked licensing from 1999 to 2005 and thus abandoned the mark before defendants used it. The trial court also rejected plaintiff's argument that defendants' activities constituted trademark dilution under the Lanham Act because the "Movie Mania" mark was not a "famous" mark and thus not entitled to a trademark-dilution remedy.

Plaintiff makes three claims on appeal, two are under the Lanham Act (trademark infringement and trademark dilution) and one under the Trademark Act (trademark infringement). Defendants ask that we uphold the trial court's grant of summary disposition with respect to these claims.

### III. STANDARD OF REVIEW AND JURISDICTION

A trial court's decision on a motion for summary disposition is reviewed de novo. *Smith v Globe Life Ins Co*, 460 Mich 446, 454; 597 NW2d 28 (1999). When our Court reviews a motion for summary disposition brought under MCR 2.116(C)(10), it considers "affidavits, pleadings, depositions, admissions, and documentary evidence filed in the action or submitted by the parties in a light most favorable to the party opposing the motion." *Id.* (citations and quotation marks omitted).[9]

"Although the federal courts have jurisdiction over trademark claims brought under the Lanham Act, that jurisdiction is not exclusive. . . . A party alleging a trademark violation under the statute may litigate in state court if it so chooses." *Bd of Regents of the Univ of Wisconsin Sys v Phoenix Int'l Software, Inc*, 653 F3d 448, 465 (CA 7, 2011).

---

[9] The trial court did not specifically identify the appropriate summary disposition subrule, but it is apparent that it is MCR 2.116(C)(10), as the trial court's consideration went beyond the parties' pleadings. *Healing Place v Allstate Ins Co*, 277 Mich App 51, 55; 744 NW2d 174 (2007).

Statutory interpretation is a question of law that is reviewed de novo. *Fradco, Inc v Dep't of Treasury*, 495 Mich 104, 112; 845 NW2d 81 (2014). When interpreting a statute, a court must "ascertain the legislative intent that may reasonably be inferred from the words expressed in the statute. This requires courts to consider the plain meaning of the critical word or phrase as well as its placement and purpose in the statutory scheme." *Id.* (citations and quotation marks omitted). "The Trademark Act is based on the common law, and it is therefore appropriate, when interpreting the statute, to consider federal and state cases that apply the common law of trademark. It is also 'appropriate to look to federal case law when interpreting a state statute which parallels its federal counterpart,' as it appears the Michigan Trademark Act does the federal Lanham Act." *Travis*, 306 Mich App at 275 (citations omitted).

IV. ANALYSIS

A. FEDERAL CLAIMS UNDER THE LANHAM ACT

We note at the outset that plaintiff merely asserts trademark infringement and trademark dilution under the Lanham Act. It devotes almost the entirety of its brief to naked licensing and abandonment under *Michigan* law—only one claim among the three it brings— and fails to discuss the relevant legal standards necessary to establish trademark infringement and trademark dilution under *federal* law.[10] "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his

---

[10] "In Michigan, there are three sources of trademark law: common law, the state Trademark Act, and the federal Lanham Act. A plaintiff may bring separate trademark-related claims under each body of law." *Travis*, 306 Mich App at 276.

claims, nor may he give issues cursory treatment with little or no citation of supporting authority." *Houghton v Keller*, 256 Mich App 336, 339; 662 NW2d 854 (2003) (citations omitted). Accordingly, plaintiff has abandoned its argument that the trial court erred when it granted summary disposition to defendants on these federal claims.

### 1. TRADEMARK DILUTION

In any event, plaintiff's federal claims, such as they are, lack merit. Its assertion of trademark dilution is particularly frivolous. 15 USC 1125(c)(1) states:

> [T]he owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

Therefore, only owners of a "famous mark" will prevail on a dilution claim. "[A] mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 USC 1125(c)(2)(A). In addition, "[f]ame for likelihood of confusion [claims][11] and fame for dilution [claims] are distinct

---

[11] "Likelihood of confusion" refers to an element plaintiffs must show to demonstrate trademark *infringement* (not trademark dilution, which is a wholly separate claim) under the Lanham Act, the Trademark Act, or the common law. See *Travis*, 306 Mich App at 275-276. Consumer perception and recognition of a mark are a necessary component of the likelihood-of-confusion analysis. The statement in *Coach* makes clear that the standard of consumer mark recognition required for a trademark-*dilution* claim is much more stringent—meaning truly na-

concepts, and dilution fame requires a more stringent showing." *Coach Servs, Inc v Triumph Learning LLC*, 668 F3d 1356, 1373 (CA Fed, 2012), citing 4 McCarthy, Trademarks & Unfair Competition (4th ed) § 24:104, p 24-325 (March 20, 2014) ("The standard for the kind of 'fame' needed to trigger anti-dilution protection is more rigorous and demanding than the 'fame' which is sufficient for the classic likelihood of confusion test.").

Needless to say, the "Movie Mania" mark is not "famous" under 15 USC 1125(c)(1) and (2)(A)—it is not "widely recognized by the general consuming public of the United States." Accordingly, the trial court correctly granted defendants summary disposition on plaintiff's trademark-dilution claim.

### 2. TRADEMARK INFRINGEMENT

Plaintiff's claim of trademark infringement under the Lanham Act is equally unavailing, because it abandoned the "Movie Mania" mark under 15 USC 1127 when it engaged in naked licensing.

### a. NAKED LICENSING

As noted, naked licensing is the practice of "allowing others to use [a] mark without exercising 'reasonable control over the nature and quality of the goods, services, or business on which the [mark] is used by the licensee'."[12] When other businesses use the mark that is the subject of naked licensing, consumers are unable to use the mark to distinguish goods and services bearing the mark as originating exclusively from the mark

---

tional, widespread recognition—than that required for a likelihood-of-confusion analysis in a trademark-infringement claim.

[12] *Eva's Bridal*, 639 F3d at 789 (citation omitted) (second alteration in original).

holder. Because naked licensing of a mark destroys the mark's ability to serve as a source identifier for consumers—in other words, destroys the mark's ability to function as a trademark—state courts held at common law that plaintiffs who engaged in naked licensing could not prevail in trademark-infringement actions against defendants who used the mark that the plaintiff nakedly licensed.[13] In trademark-law terms, a mark that is the subject of naked licensing is not "distinctive" and therefore not a valid trademark that is properly protectable under trademark law.[14]

After the passage of the Lanham Act opened the federal judiciary to trademark-law disputes in 1946, federal courts also recognized that naked licensing rendered marks not valid and made them unworthy of protection under the Lanham Act:

> If the licensor is not compelled to take some reasonable steps to prevent misuses of his trademark in the hands of others the public will be deprived of its most effective

---

[13] See, for example, *Detroit Creamery Co v Velvet Brand Ice Cream Co*, 187 Mich 312, 316; 153 NW 664 (1915) ("It has been universally held that a trade-mark, as such cannot be assigned separately and distinct from the property to which it has been attached, and likewise the rule has been laid down that a naked license to use a trade-mark is of no more validity than an assignment thereof."); *Broeg v Duchaine*, 319 Mass 711, 713; 67 NE2d 466 (1946) (holding under common law of trademark that "[o]ne who has developed a trade mark as a guaranty of the quality of his merchandise should not be permitted to license its use apart from his business to those who may sell an inferior product"); 3 McCarthy, Trademarks & Unfair Competition (4th ed), § 18:48.

[14] See, for example, *88¢ Stores, Inc v Martinez*, 227 Or 147, 160; 361 P2d 809 (1961) ("In the absence of [licensor control over licensees], the goods or services are not treated as emanating from a common source, an essential element of a common law trademark or trade name."); *Alexander Ave Kosher Restaurant Corp v Dragoon*, 306 AD2d 298, 300; 762 NYS2d 101 (2003) ("[A] licensor must have some quality control of the goods produced by the licensee."); 3 McCarthy, Trademarks & Unfair Competition (4th ed), § 18:48.

> protection against misleading uses of a trademark. The public is hardly in a position to uncover deceptive uses of a trademark before they occur and will be at best slow to detect them after they happen. Thus, unless the licensor exercises supervision and control over the operations of its licensees the risk that the public will be unwittingly deceived will be increased and this is precisely what the Act is in part designed to prevent. See Sen. Report No. 1333, 79th Cong., 2d Sess. (1946). Clearly the only effective way to protect the public where a trademark is used by licensees is to place on the licensor the affirmative duty of policing in a reasonable manner the activities of his licensees. [*Dawn Donut Co, Inc v Hart's Food Stores, Inc*, 267 F2d 358, 367 (CA 2, 1959).]

This mode of analysis shifted in 1988, when Congress revised 15 USC 1127 and codified the concept of naked licensing in a specific context: abandonment. Under the Lanham Act's revised definition of "abandoned," a trademark holder who engages in "acts of omission as well as commission" that cause the trademark to "lose its significance as a mark"—i.e., naked licensing—abandons the mark and relinquishes all rights to it. 15 USC 1127.

Accordingly, most federal cases now analyze naked licensing through the framework of abandonment: i.e., a plaintiff engaged in naked licensing and has thus abandoned its mark under 15 USC 1127.[15] However, this new analysis of naked licensing does not contradict the precodification approach, which analyzes naked licensing under the framework of the mark's validity. In fact, labeling naked licensing as "abandonment" of a mark is simply another way of saying that naked licensing renders a trademark *not valid*. In each classi-

---

[15] See, for example, *Eva's Bridal*, 639 F3d at 789; *Exxon Corp v Oxxford Clothes, Inc*, 109 F3d 1070, 1075 (CA 5, 1997); *Doeblers' Pennsylvania Hybrids, Inc v Doebler*, 442 F3d 812, 823 (CA 3, 2006); *FreecycleSunnyvale v Freecycle Network*, 626 F3d 509, 515-516 (CA 9, 2010).

fication, the trademark holder's conduct—uncontrolled licensing—causes the mark to lose its ability to function as a source identifier to consumers. See 3 McCarthy, Trademarks & Unfair Competition (4th ed), § 18:48. Stated another way, naked licensing causes the trademark to lose all significance as a trademark. Calling the mark "abandoned," as 15 USC 1127 does, or focusing on the mark's validity, as the earlier cases did, are thus two ways of describing the same concept, and both mandate the same result: a trademark holder that engages in naked licensing cannot prevail in a trademark-infringement suit against an alleged infringer using the mark that was nakedly licensed.

Plaintiffs who engage in naked licensing thus lose their rights to their mark in two ways. First, at common law, and under the Trademark Act[16] and the Lanham Act, a mark that is nakedly licensed loses its ability to function as a source identifier for consumers and thus is no longer a valid trademark. Second, under the definition of "abandoned" in 15 USC 1127, a trademark holder that engages in naked licensing abandons its trademark and loses all rights to the use of the mark.

To analyze plaintiff's federal claim of trademark infringement under the Lanham Act, then, we turn to 15 USC 1127 and its definition of "abandoned."

---

[16] As noted, "The Trademark Act is based on the common law, and it is therefore appropriate, when interpreting the statute, to consider federal and state cases that apply the common law of trademark." *Travis*, 306 Mich App at 275, citing MCL 429.44. Furthermore, "[i]t is also 'appropriate to look to federal case law when interpreting a state statute which parallels its federal counterpart,' as it appears the Michigan Trademark Act does the federal Lanham Act." *Travis*, 306 Mich App at 275 (citations omitted). Accordingly, a mark holder that engages in naked licensing of the mark renders it not valid under the Trademark Act—just as the same conduct would render the mark not valid under the common law and the Lanham Act.

### b. PLAINTIFF'S TRADEMARK INFRINGEMENT CLAIM

15 USC 1125(a)(1) allows mark holders to bring a civil action against "any person" that, among other things, confuses consumers or misrepresents the origins of the goods and services on offer. 15 USC 1127 also provides that marks can be abandoned by mark holders, and thus cease to be a mark for purposes of the Lanham Act:

> A mark shall be deemed to be "abandoned" if either of the following occurs:
>
> (1) When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.
>
> (2) When any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name for the goods or services on or in connection with which it is used or otherwise to lose its significance as a mark. Purchaser motivation shall not be a test for determining abandonment under this paragraph.

To avoid abandonment, then, the trademark holder that licenses its mark to third parties must retain *control* of the mark—which might include supervision of the licensee's operations, store layout, advertising, sales and merchandising, or other incidences of business. See *Eva's Bridal*, 639 F3d at 790. This control is essential because "[t]rademarks [are] . . . indications of consistent and predictable quality assured through the trademark owner's control over the use of the designation." Restatement Unfair Competition, 3d, § 33, comment *a*, p 338. By retaining control over the licensee that uses its mark, the original trademark holder will

ensure that the trademark remains able "to tell shoppers what to expect—and whom to blame if a given outlet falls short," and thus retain its function as a source identifier for consumers. *Eva's Bridal*, 639 F3d at 790.

Conversely, when a trademark holder relinquishes control over its mark and allows others to use the mark with little to no supervision, the trademark holder engages in naked licensing and the mark becomes abandoned under 15 USC 1127. *Exxon Corp v Oxxford Clothes, Inc*, 109 F3d 1070, 1075 (CA 5, 1997). Naked licensing "is an '[u]ncontrolled licensing of a mark whereby the licensee can place the mark on any quality or type of goods or services,' raising 'a grave danger that the public will be deceived by such a usage.' " *Doeblers' Pennsylvania Hybrids, Inc v Doebler*, 442 F3d 812, 823 (CA 3, 2006), quoting an earlier version of McCarthy, Trademarks & Unfair Competition (alteration in the original). Stated another way, naked licensing also involves "allowing others to use the mark without exercising 'reasonable control over the nature and quality of the goods, services, or business on which the [mark] is used by the licensee'." *Eva's Bridal*, 639 F3d at 789 (citation omitted) (alteration in original).

A mark holder that engages in naked licensing thus destroys its mark—it is no longer able to serve as a meaningful source identifier to consumers and accordingly loses its significance as a mark—and the protections afforded to *actual* marks under the Lanham Act. *FreecycleSunnyvale v Freecycle Network*, 626 F3d 509, 516 (CA 9, 2010) (holding that "naked licensing is *inherently deceptive* and constitutes abandonment of any rights to the trademark by the licensor") (citation and quotation marks omitted); see also 3 McCarthy, Trademarks & Unfair Competition (4th ed), § 18:48.

Plaintiff's activity in this case is a textbook example of naked licensing. Its cavalier attitude toward use of the "Movie Mania" mark is reflected in its uncontrolled licensing of the mark to two business owners over a period of six years. In 1999, plaintiff entered into a licensing agreement with CLD and allowed CLD to use the "Movie Mania" mark in conjunction with its video-rental store. Yet plaintiff provided no standards for use of the mark, advertising, store operations, or any requirements related to the rental or sale of merchandise at the CLD-owned Movie Mania.

In 2005, plaintiff repeated these actions on a more audacious scale. After Adnan Samona purchased CLD, plaintiff allowed him use of the "Movie Mania" mark—and did not require him to sign a license agreement for that use, even as he expanded his business and used the "Movie Mania" mark at those new locations. And again, plaintiff placed almost no restrictions on Samona's use of the mark, nor did it set standards for his business on advertising or store operations or outline requirements related to the rental or sale of merchandise at the Samona-owned Movie Mania. To repeat: by 2007 there were six Movie Mania stores operating in metro Detroit, and only two were owned by plaintiff. It is not possible that the "Movie Mania" mark served as an "indication[]" of consistent and predictable quality" to consumers at this point—multiple businesses used the "Movie Mania" name, and had no uniform standard of control or quality among them. Restatement Unfair Competition, 3d, § 33, comment *a*, p 338; see also *Eva's Bridal*, 639 F3d at 789.

Plaintiff's lax attitude toward its mark underwent a radical shift in 2010 when defendants expressed an interest in using "Movie Mania." But plaintiff's sudden discovery of responsible-trademark-holder religion

seems more like a conversion of convenience than a profession of genuine faith. And, in any event, plaintiff's actions by 2010—namely, its failure to control the activities and standards of the other businesses to which it had licensed the "Movie Mania" mark—had already destroyed any function of source identification that the mark possessed. The mark is thus abandoned under 15 USC 1127, and plaintiff has lost its "trademark rights against the world." *Exxon*, 109 F3d at 1075.

The trial court therefore correctly granted defendants summary disposition on plaintiff's claim of federal trademark infringement.

### B. MICHIGAN TRADEMARK ACT

Plaintiff also appeals the trial court's determination under Michigan's Trademark Act that it "abandoned" the "Movie Mania" mark when it engaged in naked licensing. We agree that the trial court wrongly held that naked licensing of a mark constitutes abandonment of the mark under the Trademark Act. But the trial court's ultimate ruling—that defendants are not liable for trademark infringement—is correct because, as noted, naked licensing of a mark destroys the mark's validity and thus renders the mark not protectable as a trademark under Michigan law. We address each issue in turn.

### 1. ABANDONMENT

MCL 429.31(i) states that a mark is

"abandoned" when its use has been discontinued with intent not to resume. Intent not to resume may be inferred from circumstances. Nonuse for 2 consecutive years shall be prima facie abandonment.

At the time period relevant to this litigation, plaintiff continuously operated a video-rental business bearing the "Movie Mania" mark. It is therefore not possible that plaintiff "abandoned" the mark under the Trademark Act's definition of that term because plaintiff never "discontinued" the mark's use. For the purposes of abandonment under the Trademark Act, it is irrelevant that plaintiff engaged in naked licensing because the Trademark Act does not recognize that naked licensing constitutes abandonment. Accordingly, the trial court improperly held that naked licensing of a mark constitutes abandonment of the mark under the Trademark Act.

### 2. TRADEMARK INFRINGEMENT

Plaintiff's underlying Trademark Act claim, however, is trademark infringement. A plaintiff that claims trademark infringement under MCL 429.42 must show that

> (1) the mark the plaintiff claims to hold is valid, in that it actually functions as a trademark, (2) the plaintiff holds priority in the mark, i.e., the plaintiff used the mark before the defendant, (3) consumers are likely to confuse the defendant's mark with the plaintiff's mark and (4) the defendant used the allegedly infringing mark. [*Travis*, 306 Mich App at 277-278 (citations omitted).]

If the plaintiff's mark is registered with the state, "the registration is prima facie evidence that the plaintiff's mark is valid, and the burden of production shifts to the defendant to demonstrate that the mark is not valid." *Id.* at 278. Under the Trademark Act and at common law, trademarks are valid when they are "(1) used in connection with the sale and advertising of products or services, and (2) distinctive, in that consumers understand the mark to designate goods or services as the

'product of a particular manufacturer or trader.' " *Id.* at 279, quoting *Shakespeare Co v Lippman's Tool Shop Sporting Goods Co*, 334 Mich 109, 113; 54 NW2d 268 (1952). Stated another way, to be "distinctive" and thus be a valid trademark, the trademark must serve as a "source identifier to consumers." *Travis*, 306 Mich App at 279, citing *Wal-Mart Stores, Inc v Samara Bros, Inc*, 529 US 205, 212; 120 S Ct 1339; 146 L Ed 2d 182 (2000).

There is no dispute that plaintiff "used" the mark "in connection with the sale and advertising" aspects of a video-rental business. However, defendants have offered convincing evidence—plaintiff's naked licensing of the "Movie Mania" mark—that "Movie Mania" is not "distinctive" and thus not valid.

Normally, the inquiry into whether a mark is distinctive focuses on the "now-classic test"[17] developed by Judge Friendly in *Abercrombie & Fitch Co v Hunting World, Inc*[18] that sorts marks into four categories—generic, descriptive, suggestive, and arbitrary or fanciful—to determine whether they distinguish a good as coming from a particular source. *Travis*, 306 Mich App at 280. But here, plaintiff's conduct makes this analysis unnecessary, because its naked licensing of the "Movie Mania" mark to other video-rental business operators has destroyed whatever distinctiveness "Movie Mania" possessed. The mark is thus not valid and is not entitled to protection under the Trademark Act. As noted in Part IV(A)(2)(a) of this opinion, plaintiffs who engage in naked licensing have *never* prevailed in a trademark-infringement suit under the common law or the Trademark Act against a defendant who uses the nakedly licensed mark for precisely this reason.

---

[17] *Wal-Mart*, 529 US at 210.

[18] *Abercrombie & Fitch*, 537 F2d at 9.

Again, when plaintiff licensed the "Movie Mania" mark to CLD in 1999 and Samona in 2005, it placed almost no restrictions on the use of the mark, nor did it make provisions for advertising, store operations, or specify any requirements related to the rental or sale of merchandise at the CLD-owned and Samona-owned Movie Manias. Because plaintiff's licensing arrangements placed little to no control or restrictions on the business operations of its licensees, it was impossible for consumers to use the "Movie Mania" mark to distinguish the videos and other merchandise on offer as coming from a particular source. *Travis*, 306 Mich App at 280; *Eva's Bridal*, 639 F3d at 790. Videos rented at Samona's locations might have been of a completely different quality or type than those on hand at plaintiff's locations, and consumers had no ability, on the basis of the "Movie Mania" mark alone, to tell that the videos came from two separate providers. Accordingly, "Movie Mania" cannot be a valid mark because it is not distinctive, and therefore does not function as a trademark: the mark does not "tell shoppers what to expect—and whom to blame if a given outlet falls short." *Eva's Bridal*, 639 F3d at 790.

Plaintiff unskillfully, and wrongly, suggests that our adoption of defendants' argument against naked licensing applies to all trademark holders who choose to license their trademarks to other parties. This confuses the general practice of licensing (which *preserves* the validity of a trademark) with plaintiff's particular conduct (which destroys the validity of a trademark).

Trademark owners are of course permitted to license their trademarks and retain their trademark rights against infringers—but only if they are careful to ensure that their marks remain a source identifier to

consumers.[19] This is because, as noted, a trademark, to be valid, must, in the mind of the consuming public, designate goods or services as the product of a "particular manufacturer or trader." *Shakespeare Co*, 334 Mich at 113. To ensure that a mark retains its source-identifying capacity, trademark holders that license their trademarks place strict restrictions on licensees— ranging from the physical appearance and layout of the licensees' businesses, to what kind of merchandise a store can carry, to frequent inspections of the licensees' physical premises and merchandise by the trademark holder.[20]

Again, plaintiff does not show that it placed any of these restrictions on or exerted any sort of control over the business operations of its multiple licensees, who operated their Movie Mania stores almost entirely at their own discretion for more than a decade. It is thus impossible that the "Movie Mania" mark could have served to designate goods or services as the product of a particular manufacturer or trader to consumers in 2010 because, at that time, a series of completely different

---

[19] " '[Trademark] licensing is permissible provided the licensor retains some degree of control over the quality of the goods or services market thereunder.' " *Vaad L'Hafotzas Sichos, Inc v Kehot Publication Society*, 935 F Supp 2d 595, 601 (ED NY, 2013) (citation omitted) (alteration in original). See also Restatement Unfair Competition, 3d, § 33, comments *b* and *c*, pp 339–342; 3 McCarthy, Trademarks & Unfair Competition (4th ed), § 18:42.

[20] *Kentucky Fried Chicken Corp v Diversified Packaging Corp*, 549 F2d 368, 387 (CA 5, 1977) ("Courts have long imposed upon trademark licensors a duty to oversee the quality of licensees' products."); *Gen Motors Corp v Gibson Chem & Oil Corp*, 786 F2d 105, 110 (CA 2, 1986) ("The critical question in determining whether a licensing program is controlled sufficiently by the licensor to protect his mark is whether the licensees' operations are policed adequately to guarantee the quality of the products sold under the mark."); *Eva's Bridal*, 639 F3d at 790 ("The sort of supervision required for a trademark license is the sort that produces *consistent* quality.").

video-rental stores had long used that mark, each with its own set of quality standards and separate business practices. Plaintiff cannot suddenly decide to enforce its trademark rights against defendants when it has already destroyed whatever validity its "Movie Mania" trademark had through its own actions.

Because the "Movie Mania" mark is not distinctive, in that it does not function as a source identifier to consumers, it is not a valid trademark. It is therefore unnecessary to discuss the other elements of trademark infringement under MCL 429.42. And though the trial court did not follow the above analysis in its holding on plaintiff's Trademark Act claim and incorrectly held that plaintiff's naked licensing constituted abandonment under the Trademark Act, it reached the correct result when it rejected plaintiff's arguments under the statute and granted defendants summary disposition.[21]

### V. CONCLUSION

Accordingly, we reject plaintiff's claims under both the Lanham Act and the Michigan Trademark Act and affirm the trial court's grant of summary disposition to defendants under MCR 2.116(C)(10).

Affirmed.

METER, P.J., and CAVANAGH, J., concurred with SAAD, J.

---

[21] "A trial court's ruling may be upheld on appeal where the right result issued, albeit for the wrong reason." *Travelers Prop Cas Co of America v Peaker Servs, Inc*, 306 Mich App 178, 201; 855 NW2d 523 (2014) (citation and quotation marks omitted).