# In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 10-2596, 10-2597, 10-2598, 10-2599

IN RE:

XMH CORP.,

*Debtor*.

APPEAL OF:

WESTERN GLOVE WORKS.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 1:09-cv-05406, -05963, -05965, -06453—**William J. Hibbler**, *Judge*.

ARGUED FEBRUARY 11, 2011—DECIDED JULY 26, 2011

Before BAUER, POSNER, and WILLIAMS, *Circuit Judges*.

POSNER, *Circuit Judge*. This appeal (actually there are multiple appeals, but only one needs to be discussed—the others are academic in light of our decision) presents two questions about the assignability of trademark licenses, in the context of a bankruptcy proceeding. The first is whether a trademark license is assignable (that is, salable) without the licensor's permission, in the absence of a clause in the agreement stating that it is assignable. The second is whether a trademark license

can be "implied" in an agreement that does not say it's a trademark license.

In 2009 a clothing firm named XMH (formerly Hartmarx) sought relief, along with a number of its subsidiaries including one named Simply Blue, under Chapter 11 of the Bankruptcy Code. As debtor in possession XMH asked the bankruptcy court for permission to sell Simply Blue's assets to Emerisque Brands and SKNL (we'll call these "the purchasers"). See 11 U.S.C. § 363. The court gave its permission. XMH told the court that an executory contract between Blue and Western Glove Works, another clothing firm, would be assigned to the purchasers because it was an asset of Blue. Western Glove Works objected to the assignment. It argued that the contract was a sublicense to Blue of a trademark licensed by Western and couldn't be assigned without its permission—which it refused to give.

The bankruptcy judge, persuaded by Western, ruled that the contract couldn't be assigned to the purchasers because Western wouldn't consent to the assignment. XMH appealed the ruling to the district court, while seeking to circumvent it by renegotiating its contract with the purchasers. Under the new contract Blue would retain title to the contract but the purchasers would assume all the duties that Blue had owed to Western under the contract and would receive all the fees to which Blue had been entitled by it.

The bankruptcy judge allowed the amendment, although it was a transparent evasion of his order forbidding assignment. Western appealed. Meanwhile the

district court, addressing XMH's appeal to it, granted a motion by the purchasers to be substituted for XMH and then ruled that the bankruptcy judge's order barring assignment of the (original) contract between Western and Blue was erroneous. This ruling disposed of Western's appeal, precipitating its appeal to us.

Western argues first that the purchasers of Blue's assets, who are also the assignees of Blue's contract with Western, waived their right to litigate the case in the district court, and in our court as well, because they didn't appeal the bankruptcy court's order forbidding assignment. XMH was the only appellant in the district court, and Western contends that because XMH is no longer a party the case should be treated as having ended with the bankruptcy court's decision in favor of Western.

But XMH's interest in the contract hadn't evaporated; it had merely migrated to the purchasers, who now stand in XMH's shoes. XMH had ceased to have any stake in the dispute with Western after it divested itself of Blue, the assets of which included Blue's contract with Western. That divestment occurred while XMH's appeal to the district court was pending, but there is nothing problematic about substituting a party into a litigation because it has succeeded to the interest of the original party. A party can lose its case in the lower court, and then assign the claim on which its case is based to someone else, and the assignee can take the case up on appeal. *Plumb v. Fluid Pump Service, Inc.*, 124 F.3d 849, 864 (7th Cir. 1997); *Cordes & Co. Financial Services, Inc. v.*

*A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 102-03 (2d Cir. 2007); see generally 6A Charles Alan Wright et al., *Federal Practice and Procedure* § 1545, pp. 346-51 (2d ed. 1990). That is essentially what happened here.

The only oddity is that as a result of the substitution of parties we now have a bankruptcy appeal to which neither the bankrupt nor a trustee is a party: we have a suit by Western against purchasers of assets from the bankrupt estate. But it would be silly to tell the parties to start over, in federal district court if there is diversity of citizenship and in state court otherwise. (Suits over assignments of trademark licenses are deemed to arise under state rather than federal law, even when the trademark is federally registered. *International Armor & Limousine Co. v. Moloney Coachbuilders, Inc.*, 272 F.3d 912, 914-17 (7th Cir. 2001); *Gibraltar, P.R., Inc. v. Otoki Group, Inc.*, 104 F.3d 616, 618-19 (4th Cir. 1997); cf. *Gaiman v. McFarlane*, 360 F.3d 644, 652 (7th Cir. 2004); *T.B. Harms Co. v. Eliscu*, 339 F.2d 823, 824, 828 (2d Cir. 1964) (Friendly, J.).) The record was made in the bankruptcy court; and anyway when a case is within federal jurisdiction when filed, later events, which would have precluded jurisdiction had they occurred before the case was filed, do not (with immaterial exceptions) deprive the federal court of jurisdiction. E.g., *Mollan v. Torrance*, 22 U.S. (9 Wheat.) 537, 539-40 (1824); *Cunningham Charter Corp. v. Learjet, Inc.*, 592 F.3d 805, 807 (7th Cir. 2010).

There is another jurisdictional issue. The purchasers argue that the district court's order setting aside the bankruptcy court's ruling that the contract between Blue and Western was not assignable was not a final

order, because the district court remanded the case to the bankruptcy court to make a final decision regarding whether to permit assignment. A debtor in possession may not assume and assign an executory contract if he has defaulted on it unless he satisfies the bankruptcy court that he's cured the default, 11 U.S.C. § 365(b)(1); *In re UAL Corp.*, 635 F.3d 312, 315 (7th Cir. 2011); and he must also provide assurance that the assignee will perform the contract. 11 U.S.C. § 365(f)(2).

But an order, even though not literally final, is appealable if all that remains to be done on remand to make it final is a "ministerial" ruling by the lower court. *In re Holland*, 539 F.3d 563, 565 (7th Cir. 2008); *In re A.G. Financial Service Center, Inc.*, 395 F.3d 410, 413 (7th Cir. 2005); *In re Lopez*, 116 F.3d 1191, 1192-93 (7th Cir. 1997); *In re Northwood Properties, LLC*, 509 F.3d 15, 21 and n. 2 (1st Cir. 2007); *In re Hicks*, 491 F.3d 1136, 1139 (10th Cir. 2007); *In re Cortez*, 457 F.3d 448, 453-54 (5th Cir. 2006). That means, as a practical matter, a ruling unlikely to give rise to a controversy that would trigger a further appeal. In *Lopez* we gave the example of "calculating prejudgment interest when the amount of the judgment, the interest rate, and the period over which the interest is to be calculated are all uncontested." 116 F.3d at 1192. We pointed out that "in such a case, the proceedings on remand are highly unlikely to generate a further appeal, so deciding the issue appealed from immediately will save time without raising the spectre of piecemeal appeals." *Id*. This is a serviceable test of finality—the Ninth Circuit has created two multifactor tests, see, e.g., *In re Fowler*, 394 F.3d 1208, 1211 (9th Cir. 2005), which strikes us

as overkill. As there are no further issues regarding the assignment of the contract between Western and Blue—no creditor has objected and Western has stipulated that there was no default by Blue and that adequate assurance of future performance has been provided—all the bankruptcy court has to do on remand (if we affirm) is to enter, with no further proceedings or analysis, an order saying that the contract can be assigned to the purchasers.

So we come at last to the merits of the appeal. Section 365(c)(1) of the Bankruptcy Code limits the assignment of an executory contract of the debtor if "applicable law" authorizes the other party to the contract to refuse to accept performance from an assignee "whether or not such contract . . . prohibits or restricts assignment." The other party is Western and the assignees whom Western refuses to accept as substitute performers for Blue are the two assignees. The contract does not prohibit or otherwise restrict assignment—and if it did the bankruptcy court could override the restriction unless "applicable law" entitles the other party to refuse to accept the substitution of the assignee for the assignor. 11 U.S.C. § 365(f); *FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 286-87 (7th Cir. 2002); *In re Midway Airlines, Inc.*, 6 F.3d 492, 495-96 (7th Cir. 1993).

The applicable law on which Western relies is trademark law. The contract with Blue recites that Western is a licensee of the trademark "Jag Jeans." ("Jag" is a federally registered trademark, owned by the Jag Licensing LLC, for "push-up pads for women's bra-style

tops; sweatshirts; pants; skirts; shorts; jeans; jackets; tops; knit tops"; we do not know whether "Jag Jeans" is another trademark owned by that company and licensed to Western, or a misnomer of the trademark "Jag.") The contract says that Western "hereby grants" Blue, which "has been formed for the purpose of designing apparel, sourcing apparel (that is, arranging for the manufacture and importation of apparel), and selling apparel," a license (that is, a sublicense) "to sell womens' jeanswear bearing the Trademark . . . [until] December 31, 2002." Blue agreed to pay Western a license fee of 12.5 percent of Blue's net sales of the trademarked apparel during the period in which the contract was in effect. Remarkably, the period was only two weeks, for the contract had taken effect on December 17.

The contract further provided that during the year following the expiration of the trademark sublicense, Western would once again "sell, for its own account, the Trademarked Apparel," while Blue would provide a variety of services related to that apparel, including "sourcing services," "marketing and sales services," "merchandising services," and "customer service." Western would "control and . . . be financially responsible for all other aspects of the production and sale of the Trademarked Apparel, including, by way of example, purchasing the apparel from [Blue's] sources, setting prices, approving the credit of prospective customers, importation, warehousing, shipping, distribution, invoicing, and collection of accounts." For the services that Blue would be providing, Western would pay Blue a fee

equal to 30 percent of Western's "Net Sales of Trademarked Apparel."

We don't know why the parties created a trademark sublicense to last only two weeks; the lawyers could not explain it at argument and no evidence was presented in the courts below. Maybe the parties didn't know either, because in March 2003, three months after the expiration of the sublicense, they agreed to extend it (retroactively to January 1, 2003, the day after the expiration of the original, two-week sublicense) to June 30 of that year and also agreed that the services provisions of the contract, which were to have kicked in on January 1, would now kick in on July 1 and run until June 30, 2007. Blue was also given an option to renew them for an additional four years, and it did renew them, in April 2007, and at that time it was given two further five-year renewal options, which allow the purchasers, if the assignment is permitted, to extend that part of the contract to the end of 2021.

We are guessing that the purpose of keeping the trademark sublicense in force for an additional six months was to give the parties a chance to decide that maybe the license with a 12.5 percent royalty based on the price of the trademarked jeans set by Blue was a superior method of regulating the relation between the parties than a services agreement that would give Blue 30 percent of the price set by Western.

In any event, if the contract still included a trademark sublicense when XMH attempted to assign the contract to the purchasers, it was not assignable. The term "appli-

cable law" means any law applicable to a contract, other than bankruptcy law, *In re Sunterra Corp.*, 361 F.3d 257, 261 n. 5 (4th Cir. 2004); *In re Pioneer Ford Sales, Inc.*, 729 F.2d 27, 28 (1st Cir. 1984); *In re Wellington Vision, Inc.*, 364 B.R. 129, 135 (S.D. Fla. 2007), since bankruptcy law would permit any assignment that was in the best interest of the creditors, subject to the limitations in section 365 previously discussed. So trademark law is applicable law. Unfortunately the parties haven't told us whether the applicable trademark law is federal or state, or if the latter which state's law is applicable (the contract does not contain a choice of law provision)—or for that matter which nation's, since Western is a Canadian firm. (Blue's headquarters are in the State of Washington.) None of this matters, though, because as far as we've been able to determine, the universal rule is that trademark licenses are not assignable in the absence of a clause expressly authorizing assignment. *Miller v. Glenn Miller Productions, Inc.*, 454 F.3d 975, 988 (9th Cir. 2006) (per curiam); *In re N.C.P. Marketing Group, Inc.*, 337 B.R. 230, 235-36 (D. Nev. 2005); 3 *McCarthy on Trademarks* § 18:43, pp. 18-92 to 18-93 (4th ed. 2010). "The purpose of a trademark, after all, is to identify a good or service to the consumer, and identity implies consistency and a correlative duty to make sure that the good or service really is of consistent quality, i.e., really is the same good or service. If the owner of the trademark has broken off business relations with a licensee he cannot ensure the continued quality of the (ex-)licensee's operation, whose continued use of the trademark is therefore a violation of trademark law." *Gorenstein Enterprises, Inc. v. Quality Care-*

*USA, Inc.*, 874 F.2d 431, 435 (7th Cir. 1989). It is even worse if the ex-licensee, rather than continuing to use the trademark himself, has sublicensed it.

A trademark is a shorthand designation of a brand. It conveys information that allows the consumer to say to himself, "I need not investigate the attributes of the product I am about to purchase because the trademark is a shorthand way of telling me that the attributes are the same as that of the like-branded product I enjoyed earlier." If without notice the seller reduces the quality of his brand, the trademark becomes deceptive because its assurance of continuity of quality is no longer truthful. That is why the licensee is not permitted to sublicense the trademark to a seller over whom the trademark owner, having no contract with the sublicensee, will have no control. It's also the reason that transfers of trademarks "in gross"—that is, apart from the assets used to produce the trademarked product—are prohibited. E.g., *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 96-97 (1918); *Green River Bottling Co. v. Green River Corp.*, 997 F.2d 359, 361-62 (7th Cir. 1993); 3 McCarthy, *supra*, § 18:3, pp. 18-8 to 18-9. If as a purchase in gross implies, the buyer doesn't want the assets that the seller had used to produce the trademarked good, this probably means that they are more valuable in some other employment—or perhaps the buyer doesn't want them because he is planning to reduce the quality of the product so that he can use cheaper inputs to produce it. In either case—the seller is either leaving the market or going out of business entirely—he is unlikely to be risking market retaliation

for selling a trademark that will be used by another firm to deceive consumers.

Often the owner of a trademark will find that the most efficient way to exploit it is to license the production of the trademarked good to another company, which may have lower costs of production or other advantages over the trademark's owner. Normally the owner who does this will not want the licensee to be allowed to assign the license (that is, sublicense the trademark) without the owner's consent, because while the owner will have picked his licensee because of confidence that he will not degrade the quality of the trademarked product he can have no similar assurance with respect to some unknown future sublicensee.

Because this is the normal reaction of a trademark owner, it makes sense to make the rule that a trademark license is not assignable without the owner's express permission a rule of contract law—what is called a "default" rule because it is the rule if the parties do not provide otherwise (as they are allowed to do). Default rules economize on the costs of contracts by saving the parties the bother of negotiating a provision that most of them want—the members of the minority that does not want such a provision are free to contract around it but the majority is saved that bother and expense. E.g., *Wal-Mart Stores, Inc. Associates' Health & Welfare Plan v. Wells*, 213 F.3d 398, 402 (7th Cir. 2000). The "best efforts" duty of an exclusive distributor is a familiar example of a contract default rule: the assumption is that a seller would not grant an exclusive distribu-

torship without requiring the distributor to use his best efforts to promote the seller's brand, so in the absence of an express provision to the contrary a best-efforts requirement is read into every exclusive distributorship. E.g., *Classic Cheesecake Co. v. JPMorgan Chase Bank, N.A.*, 546 F.3d 839, 845-46 (7th Cir. 2008); *Wood v. Lucy, Lady Duff-Gordon*, 118 N.E. 214, 214-15 (N.Y. 1917) (Cardozo, J.). The rule that trademark licenses are not assignable in the absence of a provision authorizing assignment is a similarly sensible default rule.

Since there is no such provision in the contract between Western and Blue, Blue could not have assigned the contract without Western's permission before July 1, 2003, when the trademark sublicense that Western had given Blue expired. But the assignment of the contract, of which the sublicense was a provision, to the purchasers came years later. Western, however, argues that the sublicense did not expire when it appeared to—that the services provisions of the contract, which survived the expiration of the sublicense, were actually a continuation of the trademark sublicense—maybe just an "implied" sublicense but that, Western argues, should be good enough.

We don't agree that those provisions constituted any sort of trademark license. The contract is explicit that after the expiration of the sublicense to Blue to sell Jag Jeans and pay a license fee to Western the rights in the trademark revert to Western; all the trademarked apparel held by Blue has to be returned to Western; Jag Jeans would henceforth be priced and sold by Western;

and the license fee would be replaced by a fee for specific services rendered by Blue. The services were extensive, but Western retained control over "all other aspects of the production and sale of the Trademarked Apparel," and these were, as our quotations from the contract should have made clear, also extensive.

A trademark owner (or, in this case, a trademark licensee) might delegate so much responsibility to the service provider as to lose the right or power to assure the quality of the trademarked brand, and then he would lose the trademark (or his license). *Eva's Bridal Ltd. v. Halanick Enterprises, Inc.*, 639 F.3d 788, 790-91 (7th Cir. 2011); *Draeger Oil Co. v. Uno-Ven Co.*, 314 F.3d 299, 300-01 (7th Cir. 2002); *Twentieth Century Fox Film Corp. v. Marvel Enterprises, Inc.*, 277 F.3d 253, 259 (2d Cir. 2002); *Tumblebus, Inc. v. Cranmer*, 399 F.3d 754, 764-65 (6th Cir. 2005). He would have granted, as some cases say, a "naked license," or in this case a naked sublicense, which would be the equivalent of a trademark owner's selling his trademark in gross. "Trademark law requires that 'decision-making authority over quality remains with the owner of the mark.' *Restatement* [*(Third) of Unfair Competition*] § 33 comment c [(1995)]. How much authority is enough can't be answered generally; the nature of the business, and customers' expectations, both matter. Ours is the extreme case: plaintiffs had, and exercised, *no* authority over the appearance and operations of defendants' business, or even over what inventory to carry or avoid. That is the paradigm of a naked license." *Eva's Bridal Ltd. v. Halanick Enterprises, Inc.*, *supra*, 639 F.3d at 791 (emphasis in original).

But of course Western is not arguing that it lost its license by delegating too much responsibility for the product to Blue in the service agreement (no longer services provision*s*, because after the sublicense expired all that was left was a contract for services); it is arguing that it retained the license and merely sub-licensed it, and it professes to be fearful that the "sublicensees" (as it deems them)—the purchasers of Blue's assets, who are the assignees of the service agreement—won't keep up the quality of the trademarked product; consumers will be deceived and eventually will retaliate against Western, which may forfeit its license for failing to maintain consistent quality. (As to what the consequences might be for Jag Licensing LLC, the trademark's owner, we needn't speculate.)

But if the service agreement is really a trademark license, why did the contract distinguish between a trademark license and a service agreement and make the former expire in 2003? Western has been unable to answer that question. Maybe a contract regarding a trademark could be a trademark license for some purposes but not others, but this is not argued and we are reluctant to go down that dark path. There is no good reason for courts to wrestle with classification issues in contract cases when it is easy for the contracting parties to resolve the issues themselves. If Western wanted to prevent Blue from assigning the service contract to another firm without Western's permission, all it had to do was get Blue to agree to designate the contract as a trademark sublicense, thus triggering the default rule that we have discussed and

endorsed. That would have headed off a legal dispute that courts are in a poor position to resolve. It would have been more effective than a clause forbidding assignment because it would have survived bankruptcy; anyway there was no such clause either.

AFFIRMED.