WOOD, Chief Judge.
In this case, we find ourselves in the unusual position of needing to sort out questions relating to the way in which the Commonwealth of Kentucky taxes gasoline. Problems have arisen in a bankruptcy case in the Eastern District of Wisconsin, which is why this matter is on our table, not that of the Sixth Circuit or Kentucky’s courts. The Bulk Petroleum Corporation (Bulk), has argued in an adversary proceeding that it improperly paid an excise tax when it purchased gasoline from suppliers in Louisville between November 1, 2006, and August 3, 2007. It is seeking a refund from the Kentucky Department of Revenue (KDOR). For its part, KDOR maintains that because Bulk was unlicensed during that period, it was not a “taxpayer” within the meaning of the state statute and thus is not entitled to a refund from the state. Before we can resolve that dispute, we must ensure that we have appellate jurisdiction over the case. We conclude that we do. On the merits, we conclude that Bulk should get its refund. We therefore reverse the district court’s decision and remand for entry of judgment in Bulk’s favor.
The district court described Bulk as “a large regional gasoline distributor and gas station owner with approximately 58 gas stations in Kentucky”; Bulk also had gasoline stations in Southern Indiana and Tennessee. Typically, Bulk leases a station and all necessary equipment to a tenant-operator, who handles all sales and other business for the station. Bulk receives monthly rent from the operator plus payment for all deliveries of gasoline to the station. Until October 30, 2006, Bulk held a license from Kentucky as a gasoline and special fuels dealer. KDOR revoked Bulk’s license on October 31, 2006, after it asked Bulk to post additional security and Bulk failed to do so. This did not mean that Bulk had to stop doing business in Kentucky; the change affected only the way in which Kentucky collected its fuel tax, and it raised the question presented in this case: from whom was that tax collected? (We describe Kentucky’s taxation scheme in more detail below.)
Although Bulk had the right to appeal the revocation of its license to the Kentucky Board of Tax Appeals, it did not do so. Instead, it kept track of the alleged tax payments it was making to its upstream suppliers (Marathon and BP) and repeatedly sought refunds from KDOR for those payments. In doing so, it relied on the separate line-item for the tax in the invoices it received from its suppliers. On May 10, 2007, a KDOR employee emailed Bulk informing the company that “only a licensed dealer is allowed to purchase product without the Kentucky tax for export. If your license is reinstated and all outstanding tax liabilities are satisfied, consideration will be given to your refund request.” Bulk regained its license from the state on August 3, 2007. (We will refer to the time between October 31, *670 2006, and August 3, 2007, as the Revocation Period.)
As we noted, during the Revocation Period, Marathon and BP were including on their bills to Bulk a line item representing the Kentucky fuel tax on all of the gasoline Bulk bought from them; Bulk was turning those funds over to Marathon and BP even for gasoline that was later delivered to customers outside Kentucky. (It appears that all of the gasoline at issue here did move through terminals in Louisville, Kentucky; we discuss the significance of this fact below.) Some of the gasoline Bulk purchased did stay in-state, but much of it went to Bulk’s stations in Tennessee and Indiana. Bulk maintained that the latter gasoline was not subject to Kentucky’s fuel tax.
Bulk’s financial problems did not end with the reinstatement of its Kentucky license. Approximately 18 months later, on February 18, 2009, it sought bankruptcy protection under chapter 11 in the United States Bankruptcy Court for the Eastern District of Wisconsin. Bulk filed an adversary proceeding against KDOR on May 8, 2009, seeking a refund of the excise taxes it allegedly paid while it had no license. Kentucky in the meantime had filed a proof of claim against Bulk in the bankruptcy proceeding; Bulk objected to its claim, and that matter was consolidated with the adversary proceeding. Bulk wanted over $1.3 million, but at this point it is undisputed that KDOR is entitled to offset that amount. The net amount Bulk is seeking is $774,961.30.
The bankruptcy court ruled in favor of Bulk. It found that it was Bulk that had paid the taxes, and that the taxes were not appropriately collected for gasoline that was consigned to destinations outside Kentucky. On appeal, the district court disagreed with the bankruptcy court’s first premise: that the incidence of the tax fell on Bulk. As the district court saw it, Bulk never paid any money to KDOR during the Revocation Period; it just paid a higher price to its suppliers, Marathon and BP. In addition, the court found insufficient evidence to show that Marathon and BP were collecting the tax on Bulk’s behalf. It thus reversed the bankruptcy court’s decision and remanded for further proceedings. Bulk has now appealed to us. It is supported in that effort by two inter-venors that appear in this court with our permission: the Official Committee of Unsecured Creditors of Bulk and the Bank of Sun Prairie.
II
We begin with jurisdiction. “Jurisdictional questions are pervasive in bankruptcy cases because of the tension between the ‘finality’ rule of § 158(d) and the fact that each bankruptcy proceeding contains many claims and problems, each of which may come to a final conclusion before the estate has been wrapped up.” In re Morse Elec. Co., 805 F.2d 262, 264 (7th Cir.1986). There was no problem here with the bankruptcy court’s jurisdiction over Bulk’s bankruptcy claim. See 28 U.S.C. §§ 157(a), 1334. And the bankruptcy court had jurisdiction over Bulk’s adversary proceeding against KDOR. This was a core proceeding involving “the allowance or disallowance of claims against the estate,” and thus fell comfortably within the scope of 28 U.S.C. § 157(b)(1), (b)(2)(B), and (b)(2)(E). Furthermore, the bankruptcy court may “determine the amount or legality of any tax” in a bankruptcy proceeding. As we have observed, “[t]he Bankruptcy Code expressly authorizes bankruptcy courts to decide tax issues, 11 U.S.C. § 505(a)(1), and although state taxes are not specified, the courts have interpreted the statute to cover them.” In re Stoecker, 179 F.3d 546, 549 (7th Cir.1999), aff'd sub nom. Raleigh v. Ill. Dep’t *671 of Revenue, 530 U.S. 15, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000).
So much for the bankruptcy court, which formally is a unit of the district court. See 28 U.S.C. § 151. What about the district court’s jurisdiction? The district courts have broad jurisdiction over the rulings of the bankruptcy courts. See 28 U.S.C. § 158(a). Their authority extends not just to “final judgments, orders, and decrees,” id. § 158(a)(1), but also to a wide range of interlocutory orders, id. § 158(a)(2)-(3) and concluding text. The bankruptcy court’s resolution of the Kentucky tax dispute was appealable to the district court whether or not it was “final” in the strong sense of the term.
That brings us to our own appellate jurisdiction. With an exception for interlocutory orders that does not apply here, see 28 U.S.C. § 158(d)(2), the courts of appeals have jurisdiction only over “all final decisions, judgments, orders, and decrees entered under subsections (a) and (b) of this section.” (Because the Seventh Circuit has not established a Bankruptcy Appeals Panel pursuant to § 158(b), that possibility may be disregarded here.) The question before us is whether the district court’s resolution of the tax dispute between Bulk and KDOR qualifies as a “final judgment” for purposes of § 158(d)(1). Both parties have urged us to answer that question in the affirmative and have offered their reasons for coming to that conclusion. Nevertheless, we have an independent duty to ensure that we have jurisdiction. See, e.g., ITOFCA, Inc. v. MegaTrans Logistics, Inc., 235 F.3d 360, 363 (7th Cir.2000); Horwitz v. Alloy Automotive Co., 957 F.2d 1431, 1435 (7th Cir.1992). We therefore turn directly to that task.
Bankruptcy cases have their own jurisdictional statute for a good reason: they are not simple “A + B versus C + D” matters. There is always an umbrella proceeding in which the bankruptcy court supervises the process of ascertaining what assets are in the debtor’s estate and how they should be distributed to the creditors, but as § 157(b) and (c) recognize, there are also myriad ancillary lawsuits that must be resolved as part of that process. Some, like the case before us, are labeled “core” proceedings, § 157(b)(2), and others are “otherwise related” under the Bankruptcy Code, § 157(c). (This distinction does not conclusively resolve the question whether a bankruptcy judge has the power to enter a final judgment in the proceeding. See Stern v. Marshall, — U.S.-, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011). Since we are reviewing a district court’s judgment, however, Stem does not affect our case.) Although it would have been possible as a theoretical matter to require resolution of every core proceeding, or even every non-core proceeding as well, before appellate jurisdiction in the court of appeals would exist, that has never been the understanding of § 158(d)(1). Instead, as the Supreme Court recently reminded us, “[t]he current bankruptcy appeals statute ... authorizes appeals as of right not only from final judgments in cases but from final judgments, orders, and decrees ... in cases and proceedings.” Bullard v. Blue Hills Bank, — U.S.-, 135 S.Ct. 1686, 1692, 191 L.Ed.2d 621 (2015) (citation and quotation marks omitted). We look therefore to see if the district court finally disposed of a discrete dispute within the larger case. See id.
We conclude that it did. The court rejected Bulk’s argument outright, ruling that “Bulk offered no evidence that it paid any money to the KDOR. Nor did it offer any evidence that Marathon, as the licensed dealer responsible for paying the tax, or Bulk, as the unlicensed dealer, rebutted the statutory presumption [that all gasoline was consigned to destinations within Kentucky].” This, it concluded, was *672 fatal to Bulk’s claim for a tax refund — in other words, its claim that an additional $774,961.30 should be part of its bankruptcy estate. (This explains why both of the intervening parties — the Official Committee of Unsecured Creditors and Bank of Sun Prairie — support Bulk’s position.) If that is all there is to it, then it is easy to see that we have a final disposition that is reviewable by this court. Our qualms stemmed in part from a footnote Bulk dropped in its opening brief saying that it “reserved and would seek on remand to pursue a secondary argument regarding the constitutionality of Kentucky’s taxation scheme.” Bulk may have been trying to reserve a new argument for remand, but it is too late now to do that. In any event, Bulk withdrew this claim at oral argument, and so it is out of the case for good.
Our other source of concern was based on the question whether, should we reverse, anything of substance remains to be done. We are satisfied that the answer is no. See In re XMH Corp., 647 F.3d 690, 693 (7th Cir.2011) (“[E]ven though not literally final, [the district court’s judgment] is appealable if all that remains to be done on remand to make it final is a ‘ministerial’ ruling by the lower court.”). The parties stipulated to the precise amount that Bulk would need to pay or, conversely, the size of the refund that KDOR would return to Bulk. Following our decision, the only remaining step left in this case will be for the district court to enter the proper order — if KDOR prevails, for Bulk to pay $781,924.52 to the agency (the amount that represents the remainder of the taxes Bulk owes to Kentucky) or, if Bulk prevails, for KDOR to return $774,961.30 to Bulk (the refund on the excise tax minus the amount Bulk owes KDOR). The stipulation ensures that nothing beyond these ministerial steps remains to be accomplished. We therefore have appellate jurisdiction and may turn to the merits.
Ill
We review a bankruptcy court’s judgment under the same standards used by the district court. In re Airadigm Commc’ns, 616 F.3d 642, 652 (7th Cir.2010). This means that we review the bankruptcy court’s conclusions of law de novo, Adams v. Adams, 738 F.3d 861, 864 (7th Cir.2013), and its findings of fact for clear error, Fed. R. Bankr.P. 7052.
A. Kentucky’s Taxation Scheme
We begin with an overview of the way in which Kentucky taxes commercial sales of motor fuels. (For simplicity, we refer to everything as “gasoline,” even though the statutes typically say “gasoline or special fuel.”) The state imposes its tax through Kentucky Revised Statutes (KRS) § 138.220, which reads as follows in relevant part:
(1) (a) An excise tax at the rate of nine percent (9%) of the average wholesale price rounded to the nearest one-tenth of one cent ($0,001) shall be paid on all gasoline and special fuel received in this state. The tax shall be paid on a per gallon basis.
(b) The average wholesale price shall be determined and adjusted as provided in KRS 138.228.
(c) For the purposes of the allocations in KRS 177.320(1) and (2) and 177.365, the amount calculated under this subsection shall be reduced by the amount calculated in subsection (3) of this section.
(d) Except as provided by KRS Chapter 138, no other excise or license tax shall be levied or assessed on gasoline or special fuel by the state or any political subdivision of the state.
(e) The tax herein imposed shall be paid by the dealer receiving the gasoline or special fuel to the State Treasurer in the manner and within the time specified in
*673 KRS 138.230 to 138.340 and all such tax may be added to the selling price charged by the dealer or other person paying the tax on gasoline or special fuel sold in this state.
(f) Nothing herein contained shall authorize or require the collection of the tax upon any gasoline or special fuel after it has been once taxed under the provisions of this section, unless such tax was refunded or credited.
KY.Rev.Stat. § 138.220(1) (emphasis added). The state notes that it is the receiving party who must pay the tax (subpart (a)), and that the tax “may” be added to the selling price charged by the party who first paid the tax (subpart (e)). This indicates that under Kentucky law, the incidence of the tax falls on the receiving party, no matter who is taking care of the mechanics of collection. If Bulk is the receiving party, therefore, then under state law it is the party both obligated to pay the tax and entitled to seek any refund that might be due.
If a dealer is licensed, it does not actually pay the tax to KDOR until after the month in which the fuel is received. Id. §§ 138.240 (reports of gasoline received and sold), 138.280(1) (payment of tax made for “preceding calendar month”). The importance of the license is revealed in KRS § 138.310(1), which states that
No person shall refine, produce, distill, manufacture, blend, compound, receive, use, sell, transport, store, or distribute any gasoline or special fuel upon which the tax due has not been paid or assumed or engage in the sale, storage or transportation of any gasoline or special fuel within this state upon which the tax has not been paid unless he is the holder of an uncanceled license issued by the Department of Revenue to engage in the business.
Id. § 138.310(1) (emphasis added). In other words, licensed dealers enjoy the privilege of paying the tax retrospectively. This enables them to reconcile on a monthly basis the gasoline “received” for statutory purposes within Kentucky (taxable gasoline) and the gasoline “received” outside of Kentucky (fuel on which no tax is due).
Although it may seem a bit counterintui-tive, unlicensed dealers are not banned from engaging in the gasoline market in Kentucky. They simply cannot take advantage of the ability to compute the percentage of the gasoline they received that wound up in Kentucky and hence was taxable by that state. Bulk’s experience is typical. When it lost its license and thus became an unlicensed gasoline dealer, its upstream suppliers (Marathon and BP) included an item in each invoice for “Kentucky gasoline tax.” Whether this had the effect of making them the “taxpayers” for purpose of any effort to obtain a refund, or whether they were acting on Bulk’s behalf in this respect, is the central question before us.
Kentucky uses a presumption that all gasoline delivered within the state is destined for use within the state. Id. § 138.210(15)(a). Licensed dealers, as we have explained, are entitled to rebut that presumption with the evidence of actual destinations. Id.
B. Bulk’s Request for a Refund
While Bulk was unlicensed, it sought to rebut that presumption by filing claims for refunds for taxes that it says it paid on gasoline sent along to Indiana and Tennessee. KDOR turned down its request in an email dated May 10, 2007:
We are in receipt of your request of refunds for the months of November 2006, December 2006, January thru April 2007.
During this period your Kentucky Dealer’s license was cancelled. Because of this you were correctly charged the Ken *674 tucky tax. Only a licensed dealer is allowed to purchase product without the Kentucky tax for export.
If your license is re-instated and all outstanding tax liabilities are satisfied, consideration will be given to review your refund request.
Gene Round, Kentucky Revenue Cabinet, (emphasis added). The highlighted part of that email suggests that KDOR regarded Bulk as the one who was paying the tax during the Revocation Period.
Despite the email, Bulk continued to seek refunds for each month until it regained its Kentucky license. Once Bulk’s license was restored, KDOR emailed BP with this message: “The motor fuels gasoline dealers license and motor fuels special dealers license have been reinstated for Bulk Petroleum effective today August 8, 2007. Now when Bulk purchases fuel you should not charge the tax as stated in KRS 138.310.” As instructed, Marathon and BP promptly stopped including the line item for the Kentucky tax on all invoices for deliveries after that date. By then, KDOR took the position that Bulk had paid no taxes at all during the Revocation Period and thus was not entitled to any refund. Bulk’s refund claims were pending at the time Bulk filed its bankruptcy petition, which is why they have reached us.
C. Who “Received” the Gasoline and When Did Receipt Occur?
In order to decide who paid the contested taxes, we first look at a related question: where and when was Bulk’s gasoline “received” during the Revocation Period. Section 138.220 provides that gasoline “received” in Kentucky is subject to that state’s tax. Kentucky does not assert the right to tax gasoline received outside the state, although it does make it difficult (if not impossible) for an unlicensed dealer to show that its purchases were received out-of-state. KDOR argues the gasoline in question is received by Bulk at the moment Marathon and BP load it into Bulk’s trucks. Bulk says that it is received only when its trucks arrive at the retail gas station.
To resolve this debate we turn to the statute for guidance. KRS § 138.210(15) defines “received” in two ways. Subpart (a) provides that gasoline “acquired by any dealer and delivered into or stored in ... pipeline terminal storage facilities in this state shall be deemed to be received when it has been loaded for bulk delivery into tank cars or tank trucks consigned to destinations within this state.” It then establishes a presumption that any gasoline so loaded is for in-state delivery “unless the contrary is established by the dealer....” KY. REV. STAT. § 138.210(15)(a). The second definition, found in subpart (b), covers gasoline “not delivered into ... pipeline terminal storage facilities.” Id. § 138.210(15)(b). That gasoline is “deemed to be received when it has been placed into storage tanks ... • for use or subject to withdrawal for use. [or] delivery,” but dealers are deemed to have received the fuel at the time of withdrawal from the storage facility. Id. ■
Neither of these definitions supports Bulk’s idea that receipt occurs only at the moment its trucks arrive at a retail gas station. Instead, they indicate that the tax is due from someone at the moment the gasoline is loaded from the terminal facility into a tank truck. That is the point at which Kentucky law creates its presumption that the gasoline is “consigned to destinations within” Kentucky. Id. § 138.210(15)(a). That presumption can be rebutted only by “the dealer.”
This case does not involve any gasoline loaded into tank trucks owned or operated by BP or Marathon; it deals only with the gasoline loaded into Bulk’s trucks. In *675 spite of the statutory language we have reviewed, KDOR argues that Bulk was not the party that received the gasoline when the fuel was loaded into Bulk’s trucks at the Louisville terminal. Instead, it contends, BP and Marathon somehow received the gasoline at that moment. That makes no sense and cannot be squared with the statutory definition. BP and Marathon did not “receive” the gasoline when they delivered it to Bulk’s trucks at the Louisville terminal. They already had it by that time and were delivering it to an intermediate supplier of retail gas stations. Under KDOR’s theory, every transaction in gasoline that begins at the Louisville terminal, whether for a dealer or not, and whether destined for in-state or out-of-state buyers, can be taxed by Kentucky, because they all have an immediate destination in Kentucky (the Louisville terminal). That is not a sensible reading of Kentucky law. Gasoline for licensed and unlicensed dealers alike is received when it is loaded into the tank trucks (which are presumptively headed for places in Kentucky).
The only difference between the licensed and the unlicensed dealers lies in how the tax is paid, not when the product is received. And, as we now explain, Kentucky law does not exempt unlicensed dealers from paying the tax; it simply withdraws from them the privileges of reconciling the amounts due and of serving as collector and remitter. Only licensed dealers, including for our purposes BP and Marathon, may fulfill those responsibilities.
Kentucky law shows that even though BP and Marathon were collecting the tax and turning that revenue over to KDOR during the Revocation Period, Bulk is the entity on which the full incidence of the tax fell. By statute, Kentucky designates every licensed dealer, including for this purpose BP and Marathon, as not just an agent, but a trust officer of the state. As the statute puts it, “[b]y virtue of the allowance provided by KRS 138.270 to dealers for collecting and remitting the tax, every dealer is a trust officer of the state.” Id. § 138.280(2). State law requires the gasoline tax to be “paid by the dealer receiving the gasoline ..., and all such tax may be added to the selling price charged by the dealer or other person paying the tax-” Id. § 138.220(l)(e). When Bulk was a licensed dealer, this meant that it was entitled to add the tax to the selling price it charged to its Kentucky customers. When it was not a licensed dealer, it was BP and Marathon (ie., “other person[s]”) that were authorized to add the tax to the invoices they sent to Bulk. In their capacity as trust officers with respect to those funds, they had no right simply to pocket whatever they chose to keep; they had an obligation to turn the tax collections over to the state in a timely fashion.
KDOR did not introduce the idea that Bulk had never paid any tax at all, and thus that Bulk was not entitled to any refund, until after Bulk’s license was restored. KDOR gets to that position on the theory that Bulk’s suppliers, BP and Marathon, simply charged a higher price for the gasoline they sold to Bulk during the Revocation Period. The fact that some of the money went to the state as a tax did not, it says, make Bulk the taxpayer. And if Bulk was not the taxpayer, it cannot be entitled to a refund.
That argument is hard to reconcile with one of the few Kentucky cases we have been able to find that bear on this subject. In a case involving a challenge to the Kentucky fuel tax on the grounds that the state improperly taxed fuel used outside the state, the Kentucky Court of Appeals rejected the position KDOR adopts here, writing that “[tjhere is no merit in the claim that appellees were not ‘taxpayers.’ They did pay the tax as a separate item on *676 all purchases of special fuel and the parties stipulated that they were ‘required’ to pay them. The burden of the tax was intended to be, and is, borne by the ultimate consumer, and even though the seller who collects and reports it is also a taxpayer, it is simply unrealistic to argue that appel-lees were not taxpayers.” Dep’t of Revenue v. Jack Cole Co., 474 S.W.2d 70, 72 (Ky.1971) (citations omitted).
The state’s argument also seeks to take some advantage of an analogy to the antitrust doctrine that precludes indirect purchasers from suing to recover cartel overcharges. See Ill. Brick Co. v. Illinois, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) (federal law); Arnold v. Microsoft Corp., No.2000-CA-002144-MR, 2001 WL 1835377 at *3, *7 (Ky.Ct.App.2001) (applying Illinois Brick to case brought under Kentucky’s version of the Sherman Act, KY. REV. STAT. § 367.175). The idea is this: if Companies A, B, and C get together and agree to fix prices, one can assume that the fixed price will be higher than the competitive price (let’s say 10% higher). A cartel member, Company B, now sells a Widget to Distributor D, who must pay the overcharge. Distributor D folds the higher cost of acquisition into its price to Retailer R. Under Illinois Brick, only D has the right to sue the cartel to recover the overcharge paid; R, the indirect purchaser, has no claim. See Motorola Mobility LLC v. AU Optronics Corp., 775 F.3d 816, 823 (7th Cir.2014), cert. denied, — U.S. -, 135 S.Ct. 2837, — L.Ed.2d - (2015). D has the sole right to sue even if D recouped some or all of the hypothetical 10% overcharge when D sold the Widget to R. The Supreme Court has several reasons for following this rule: the difficulty of ascertaining how much of the overcharge is passed on, without a sophisticated study of market elasticities; the benefit of assigning the claim to the more efficient enforcer — that is, the party that is closer to the wrongdoers; and the difficulty of apportioning damages accurately if parties at all levels have the right to sue.
KDOR says “just so here.” No one can know, it argues, what the effect of the suppliers’ higher price (that included the gasoline tax) had on downstream purchasers like Bulk. Under Illinois Brick’s logic, it continues, no one can know how much of the tax burden really landed on Bulk, because the actual payor of the tax was the supplier. Thus, it concludes, only Marathon and BP would be entitled to seek the refund.
A closer look at that reasoning shows that it suffers from a number of problems. First is the accuracy of KDOR’s characterization of the tax as just another component of the final bill. Kentucky’s statutory scheme shows that this is not the case. Recall that the statute designates every licensed dealer, including for this purpose BP and Marathon, “a trust officer of the state.” KY. REV. STAT. § 138.280. That means BP and Marathon are in effect sending Bulk two bills: one for the gasoline, which on a typical invoice includes such line items as charges for different blends that are sold, a charge for a promotional fund, a federal environmental fee recovery, and a federal gasoline tax; and a second bill for the Kentucky gasoline tax. Under the law, BP and Marathon operate as state tax collectors for the second bill; they hold the tax monies collected from Bulk in trust for the state and have a duty to turn over those amounts to the state.[1] *677 That is why, when Bulk reacquired its license, KDOR told BP to stop charging Bulk the excise tax. Even though BP and Marathon delivered their product to the Louisville terminal, it was clear at that point that no tax was due on shipments destined for out-of-state purchasers.
Before we go down this path, however, there is another aspect of the Illinois Brick doctrine that we must examine: the so-called cost-plus exception. The original Illinois Brick decision (which in turn relied on Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968)), recognized that there might be some situations, such as a pre-existing cost-plus contract, in which either a passing-on defense or an indirect suit might be possible. But in Kansas v. UtiliCorp United, Inc., 497 U.S. 199, 110 S.Ct. 2807, 111 L.Ed.2d 169 (1990), the Court made it clear that this exception would rarely apply, if indeed it still could be invoked at all. In UtiliCorp, the respondent UtiliCorp, a public utility, purchased natural gas from a pipeline and several production companies. UtiliCorp sued its suppliers, asserting that they had conspired to raise the price of gas in violation of the federal antitrust laws. The States of Kansas and Missouri also sued, on behalf of consumers in their states. The defendants argued that the states lacked standing to sue, because the citizens were in effect indirect purchasers. The lower courts agreed with this view and dismissed the states’ actions; the Supreme Court affirmed. Id. at 219, 110 S.Ct. 2807.
In so doing, the Court rejected the states’ argument analogizing the prices charged by regulated utilities to preexisting cost-plus contracts. Fundamental to its analysis was the assumption that the direct purchasers were, in fact, folding the overcharge into the price they set for their own customers, the indirect purchasers. It noted that it could not tell “whether the respondent could have raised its prices prior to the overcharge,” or whether the utility regulators would have permitted a rate increase based on factors other than cost. Id. at 210, 110 S.Ct. 2807. Difficult questions of timing also were present, because the passing-on process could be delayed by the need to seek approval for rate increases. Id. Finally, the Court noted that under some regulatory regimes, any recovery that the direct purchaser collected from the cartel would need to be passed along to the indirect purchasers. The present situation is different. Rather than a cartel overcharge that is difficult to quantify, we have a specifically stated tax that the sellers are required to collect from the party who owes the money and then remit to the state.
Value-added taxes, which are common in the rest of the world, operate in much the same way. They are designed to tax consumption, and so their incidence falls on the consumer even though they are collected by a retailer. For a general description of their operation, see, e.g., Frequently Asked Questions, Euro Vat Refund, http:// www.eurovat.com/faq.htm; Value-added Tax, Wikipedia, https://en.wikipedia.org/ wiki/Value-added_tax (both last visited July 30, 2015, as were all websites cited in this opinion). Final consumers from the taxing country must pay the tax, but foreign tourists are entitled to a refund when they return home, even though the store collected the tax. Id. Kentucky does not have a value-added tax, but it does have a sales tax that is specifically imposed on “all retailers.” KY.Rev.Stat. § 139.200. The retailer must collect that tax from the *678 purchaser. Id. Just as BP and Marathon did with the gasoline tax, “[t]he tax shall be displayed separately from the sales price ... or other proof of sales.” Id.; see also Revenue Cabinet v. Moors Resort, Inc., 675 S.W.2d 859, 860-61 '(Ky.Ct.App.1984). Like most states, Kentucky also imposes a use tax directly on Kentucky consumers who buy goods outside the state and bring them home. See KY.Rev. Stat. § 139.310. Such a use tax can be collected directly from the consumer, and the incidence of the use tax falls on the consumer, see Ky. ex rel. Ross v. Lee’s Ford Dock, Inc., et al, 551 S.W.2d 236, 238 (Ky.1977), but courts have also upheld the right of a state to require the out-of-state seller to collect and remit such a tax. See, e.g., Gordon v. Holder, 721 F.3d 638, 651 (D.C.Cir.2013); Rosenow v. State of Ill., Dep’t of Revenue, 715 F.2d 277, 280-81 (7th Cir.1983). Indeed, many states have been lobbying hard to impose such a collection obligation on internet retailers such as Amazon. See http://www.cnet.com/ news/politieians-retailers-push-for-new-internet-sales-taxes/.
The idea of having one entity collect taxes for the state even though the tax is legally owed by another party is thus not foreign to Kentucky. And that is what BP and Marathon were doing for Bulk during the Revocation Period. For all of its sales within Kentucky, Bulk is obliged by state law to pay the gasoline tax; that obligation would exist even if BP and Marathon did not include the tax on their bills to Bulk. That shows, incidentally, that the fact that the suppliers are collecting the tax does not have the kind of effect on the elasticity of demand that worried the Court in Illinois Brick and UtiliCorp, and presumably that would worry the Kentucky courts, since they follow federal law in this area. To the extent that the gasoline BP and Marathon sell to Bulk is destined for out-of-state final purchasers, a refund is due to the entity that bears the tax. That entity, we conclude, is Bulk, whether the tax appears on a separate line on the invoices it receives from its own suppliers, or (when it was licensed) it is computed at the end of the month following its own sales.
D. Other Arguments
KDOR argues that its interpretation of the statute, under which Bulk is not a “taxpayer,” avoids constitutional problems that flow from a state tax of interstate commerce. It does so, however, only by the unsatisfactory device of asking us to muzzle Bulk by depriving it of standing to challenge the tax. But there is no problem with Bulk’s standing here: Bulk wants money, KDOR’s decisions have stood in the way, and if the court rules in Bulk’s favor it will get its money. That is all that is needed for standing.
If KDOR is arguing instead on the merits that any right to a refund Bulk may have must be pursued against BP and Marathon, that is a different matter. At oral argument we asked whether Bulk’s contracts with its suppliers had anything to say about this possibility. The answer, both from counsel and from our own look at the record, appears to be no, and in any event, Bulk evidently has not asked. This would theoretically have been an intermediate point between a holding that Bulk is the party entitled to pursue a refund directly against the state and a holding that Kentucky gets a windfall. The notion that relief for Bulk is a matter of private ordering between Bulk and the suppliers is, however, inconsistent with our understanding of the suppliers’ role as mere collectors of the tax from Bulk, and remitters to the state.
Another flaw in KDOR’s position is its failure to take into account KRS §§ 138.220 and 138.224. Section 138.220 allows a licensed dealer to add the excise tax to the selling price, as Marathon and *679 BP did, but it does not require a dealer to do so. If Marathon and BP had not added the tax when they sold the gasoline to Bulk, presumably KDOR could have collected the tax on the gasoline Bulk delivered in Kentucky under § 138.224. That statute makes a dealer jointly and severally liable for failing to comply with the fuel tax statute and regulations. KY.Rev.Stat. § 138.224. All § 138.224 does is enable a more efficient system of privatized collection; that system makes it easier for the state to collect revenue. The joint and several liability feature fatally undermines KDOR’s argument that Bulk is not a taxpayer within the meaning of the fuel tax statute. If Bulk is liable for the tax under that statute, how is it not a taxpayer?
KDOR last invokes public policy: if we rule for Bulk, it pleads, we will undermine the entire regulatory apparatus through which Kentucky collects its fuel taxes. Dealers will no longer want to be licensed, it predicts, because they will get the tax on out-of-state transactions abated one way or the other. This argument overlooks economic reality. A gasoline dealer will always prefer to be licensed, for several reasons. First is the right enjoyed only by licensed dealers to defer payment of taxes until the month after sales are made, when real data show how many taxable (within Kentucky) sales occurred and how many nontaxable (out-of-state) sales occurred. Second is the certainty of being able to avoid tax on the latter sales, rather than (as Bulk did) be required to wait an indefinite time until a license can be procured and obtain the refund only then. Third, it is unclear how much (if any) interest Kentucky is paying on the delayed refunds. Considering the amount of the taxes involved in these transactions and the time-value of money, we think it far more likely that fuel dealers will always prefer being licensed.
Finally, it is more efficient to require Bulk, rather than Marathon or BP, to rebut the state’s presumption that the gasoline stayed in Kentucky. See KY.Rev. Stat. § 138.224. Marathon or BP, like any upstream supplier, has no easy way of knowing when its customer will withdraw gasoline from the terminal or where those tank trucks will go. It is hard to see why they would care. Bulk, in contrast, has all of the necessary documents to show where the gasoline went, it keeps this information for independent business purposes, and it easily can provide them to KDOR.
Although the parties did not mention the Eleventh Amendment in this case, it is worth noting why it does not bar this litigation. In brief, it is because we are dealing with a claim in bankruptcy. To the extent that Bulk, a Wisconsin corporation, ordinarily would sue the Commonwealth of Kentucky for a tax refund, it would do so in state court under whatever waiver of sovereign immunity Kentucky has provided. Indeed, before it filed for bankruptcy, Bulk was attempting to exhaust its state administrative remedies; presumably state court would have been the next step. Once Bulk filed for bankruptcy, however, everything changed. Kentucky sought an affirmative recovery from Bulk in the adversary proceeding in the amount of $781,924.52; Bulk wanted $1,556,885.82 from Kentucky, less the amount Kentucky was pursuing, for a net of $774,961.30. This brings both cases within the rule of Central Va. Cmty. Coll. v. Katz, 546 U.S. 356, 375, 126 S.Ct. 990, 163 L.Ed.2d 945 (2006), which held that “the Bankruptcy Clause of Article I, the source of Congress’ authority to effect this intrusion upon state sovereignty, simply did not contravene the norms this Court has understood the Eleventh Amendment to exemplify.” Rather, the “States agreed in the plan of the [Constitutional] Conven *680 tion not to assert any sovereign immunity defense they might have had in proceedings brought pursuant to ‘Laws on the subject of Bankruptcies.’ ” Id. at 377, 126 S.Ct. 990. State sovereign immunity, as reflected by the Eleventh Amendment, does not bar Bulk’s claim.
IV
The district court’s judgment is ReveRSed and REMANDED for entry of a judgment requiring KdoR to pay Bulk a tax refund in the amount of $774,961.30.

. This case is thus different from the situation presented in Commonwealth Edison Co. v. Montana, 453 U.S. 609, 101 S.Ct. 2946, 69 L.Ed.2d 884 (1981), in which the Supreme Court decided that the true incidence of a severance tax fell on the initial payor of that tax (Montana coal mines), not on their customers, who were largely out-of-state. If state law had imposed a duty on the coal mines to collect taxes in trust for the state from the out-of-state purchasers, the cases *677 would be much closer. But Montana emphatically denied that it was doing anything of the sort; the Court accepted its characterization; and Montana's tax thus avoided condemnation under the Commerce Clause.