# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 10-2863

EVA'S BRIDAL LTD. and SAID GHUSEIN,

*Plaintiffs-Appellants,*

*v.*

HALANICK ENTERPRISES, INC., and NAYEF GHUSEIN,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 C 1668—**John W. Darrah**, *Judge.*

ARGUED FEBRUARY 9, 2011—DECIDED MAY 10, 2011

Before EASTERBROOK, *Chief Judge*, and FLAUM and RIPPLE, *Circuit Judges.*

EASTERBROOK, *Chief Judge*. In 1966 Eva Sweis established in Chicago a shop that she called "Eva's Bridal." It sold dresses for brides and bridal parties. The venture was a success; Sweis allowed her children to open their own shops under the same name. The business passed to Said and Nancy Ghusein (née Sweis), who operate an

"Eva's Bridal" shop in Oak Lawn, one of Chicago's suburbs. They have continued the pattern of licensing the name to relatives. Three years after opening a shop in Orland Park, another of Chicago's suburbs, Said and Nancy Ghusein sold that operation to Nayef Ghusein for $10. The agreement required Nayef to pay $75,000 a year for the right to use the "Eva's Bridal" name and marks.

The license agreement expired in 2002. Nayef and his corporation Halanick Enterprises have continued to operate the store under the Eva's Bridal name (see http://www.evasbridalsoforlandpark.com/) but no longer remit a royalty. In 2007 Said and his firm Eva's Bridal Ltd. filed this suit under the Lanham Act, contending that Nayef and Halanick have violated the Act by using the "Eva's Bridal" mark without payment (or, for that matter, a current license agreement). See 15 U.S.C. §§ 1117, 1125(a).

The district judge did not decide whether plaintiffs waited too long before suing. Instead the court dismissed the suit, 2010 U.S. Dist. LEXIS 79186 (N.D. Ill. Aug. 4, 2010), on the ground that plaintiffs abandoned the "Eva's Bridal" mark by engaging in naked licensing—that is, by allowing others to use the mark without exercising "reasonable control over the nature and quality of the goods, services, or business on which the [mark] is used by the licensee". *Restatement (Third) of Unfair Competition* §33 (1995); see also *id*. §30 (discussing abandonment); *TMT North America, Inc. v. Magic Touch GmbH*, 124 F.3d 876, 885–87 (7th Cir. 1997). The written agree-

ment did not require Nayef and Halanick to operate the Orland Park store in any particular way and did not give the licensor any power of supervision over how the business was conducted. Nancy conceded during her deposition that she and her husband Said never tried to control any aspect of how defendants' shop operated or how the mark was used. The district judge concluded that the mark has been abandoned and that defendants therefore may use it without payment.

Plaintiffs do not dispute the proposition that a naked license abandons a mark. Instead they observe that many decisions say that a licensor must supervise to ensure quality control, and they insist that they have never doubted the high standards of Nayef and his firm, so they had no reason to superintend any aspects of defendants' business. Plaintiffs maintain that Nayef and Halanick sell dresses from the same designers that the shop carried when it opened in 1988 and when ownership changed in 1991. Because consumers care about who designs and makes the clothing, which determines how the dresses look when worn, plaintiffs maintain that there was no need for any form of regulation. Doubtless consumers also care about the quality of service, whether the dressing rooms are clean and the staff helpful, whether alterations are performed accurately and on time, and so forth—matters about which plaintiffs left defendants to their own devices—but it is not necessary to decide which aspects of a retail bridal business contribute most to customers' satisfaction.

This argument that licensors may relinquish all control of licensees that operate "high quality" businesses misunderstands what judicial decisions and the *Restatement* mean when they speak about "quality." There is no rule that trademark proprietors must ensure "high quality" goods—or that "high quality" permits unsupervised licensing. "Kentucky Fried Chicken" is a valid mark, see *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368 (5th Cir. 1977), though neither that chain nor any other fast-food franchise receives a star (or even a mention) in the *Guide Michelin*. The sort of supervision required for a trademark license is the sort that produces *consistent* quality. "Trademarks [are] indications of consistent and predictable quality assured through the trademark owner's control over the use of the designation". *Restatement* §33 comment b. See also William M. Landes & Richard A. Posner, *The Economic Structure of Intellectual Property Law* 166–68, 184–86 (2003).

A person who visits one Kentucky Fried Chicken outlet finds that it has much the same ambiance and menu as any other. A visitor to any Burger King likewise enjoys a comforting familiarity and knows that the place will not be remotely like a Kentucky Fried Chicken outlet (and is sure to differ from Hardee's, Wendy's, and Applebee's too). The trademark's function is to tell shoppers what to expect—and whom to blame if a given outlet falls short. The licensor's reputation is at stake in every outlet, so it invests to the extent required to keep the consumer satisfied by ensuring a repeatable experience. See generally *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992).

How much control is enough? The licensor's self-interest largely determines the answer. Courts are apt to ask whether "the control retained by the licensor [is] sufficient under the circumstances to insure that the licensee's goods or services would meet the expectations created by the presence of the trademark." *Restatement* §33 comment a (summarizing doctrine); see also *id*. at Reporter's Note comment c (collecting authority, which we need not set out). It isn't necessary to be more specific here, because plaintiffs did not retain *any* control—not via the license agreement, not via course of performance. A person who visited Eva's Bridal of Oak Lawn and then Eva's Bridal of Orland Park might not have found a common ambiance or means of doing business. And though the shops may have had many designers in common, this would not distinguish an "Eva's Bridal" shop from any other bridal shop; the trademark would not be doing any work if identical dresses could be purchased at Macy's or Nordstrom, and the "Eva's Bridal" shops were dissimilar except for some products that many retailers carried. Safeway could not license its marks to a corner grocery store, while retaining no control over inventory, appearance, or business methods, just because every grocery store is sure to have Coca-Cola and Wheaties on the shelf.

Trademark law requires that "decisionmaking authority over quality remains with the owner of the mark." *Restatement* §33 comment c. How much authority is enough can't be answered generally; the nature of the business, and customers' expectations, both matter. Ours is the extreme case: plaintiffs had, and exercised, *no*

authority over the appearance and operations of defendants' business, or even over what inventory to carry or avoid. That is the paradigm of a naked license.

AFFIRMED