# United States Court of Appeals

## For the Eighth Circuit

_____

No. 18-2658
_____

Lawn Managers, Inc., a Missouri Corporation

*Plaintiff  Appellee*

v.

Progressive Lawn Managers, Inc., a Missouri Corporation

*Defendant  Appellant*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: April 17, 2019
Filed: May 20, 2020

_____

Before SMITH, Chief Judge, KELLY and KOBES, Circuit Judges.

_____

KELLY, Circuit Judge.

In this trademark infringement case, Progressive Lawn Managers, Inc., (Progressive) appeals from the district court's[1] findings of fact and conclusions of law

---

[1] The Honorable David D. Noce, United States Magistrate Judge for the Eastern District of Missouri, to whom the case was referred for final disposition by consent of the parties pursuant to 28 U.S.C. § 636(c).

after a bench trial finding it liable for trademark infringement and awarding damages to Lawn Managers, Inc. (Lawn Managers). We affirm.

I

A

Lawn Managers and Progressive are two Missouri lawn care businesses owned by Randy Zweifel and Linda Smith, respectively. Prior to Smith's incorporation of Progressive, she and Zweifel were married and together owned and operated Lawn Managers for nearly 20 years in the St. Louis area. In April 2012, Zweifel and Smith divorced and entered into a marital settlement agreement (MSA) that was incorporated into a divorce decree issued by the Circuit Court of Jefferson County, Missouri, the following month.

Section 5 of the MSA, which we understand to be the parties' trademark licensing agreement, disposed of Zweifel's and Smith's interests in the Lawn Managers business. Smith agreed to assign her 50% interest in the company to Zweifel. Zweifel would retain the corporate name of Lawn Managers, Inc., and all right, title, and interest in the business, except for, as relevant here, some commercial and residential accounts and business equipment specifically awarded to Smith, who would now operate a separate business. Section 5.02 divided Lawn Managers' then-existing accounts and accounts receivables. It awarded "all right, title, and interest" in certain enumerated commercial accounts to Smith; the remainder went to Zweifel. Residential accounts, in turn, were divided by zip code, with each party receiving "all right, title, and interest in all residential accounts and accounts receivables" contained within specified zip codes. Section 5.03 divided between the parties various vehicles, outdoor equipment, and indoor office equipment.

Section 5.06 specified the conditions for the parties' "Development of New Business" and provided that the parties would share the use of the corporate name "Lawn Managers" for a period of time. Zweifel and Smith agreed that Zweifel would retain ownership and control of the Lawn Managers business but that Smith could use the corporate name "Lawn Managers" for two years after the dissolution of their marriage by establishing a new lawn care company "using the name Progressive Lawn Managers, Inc. doing business as Lawn Managers." While Smith used the name Lawn Managers, she could "use the credit of Lawn Managers, Inc. to purchase equipment for her new business," provided she ensured Zweifel would not be liable for her purchases. At the end of the two years, Smith would discontinue her use of the Lawn Managers name and would use only the name Progressive Lawn Managers. The parties also agreed to a non-solicitation clause providing that for two years after the dissolution of their marriage, "[Smith] and her employees [would] refrain from soliciting residential accounts and commercial accounts in the zip codes that have been awarded to [Zweifel]," and Zweifel would do the same in Smith's zip codes.

Not long after their divorce was finalized, Zweifel and Smith commenced divorce-related litigation in state court. Smith filed her first motion for contempt against Zweifel in early 2013, followed by cross-motions filed by each party. On July 25, 2014, Zweifel and Smith settled their cross-motions through a written agreement that changed a few terms of the licensing agreement. The Settlement Agreement extended Smith's ability to use the Lawn Managers name to December 31, 2014. It also changed the parties' limitations on obtaining new business. The parties could now sign up and service new commercial accounts regardless of zip code, but they could not "sign up or service any new residential accounts in the zip codes awarded to the other in their divorce settlement . . . ." The Settlement Agreement specified that "[t]his non compete agreement shall remain in effect for two years from [July 25, 2014,] and is enacted in lieu of the prior non-solicitation clause found in [§] 5.06 of the [licensing agreement]."

As contemplated by the licensing agreement, Zweifel continued to operate the Lawn Managers business, and Smith began operating Progressive using both the name Progressive Lawn Managers and, simply, Lawn Managers. Smith's company used the two names in advertisements, business materials, and representations to third parties. Some employees who worked for Lawn Managers before the divorce went to work for Smith. The public, however, did not know of Zweifel and Smith's divorce or the terms of the licensing agreement.

In February 2015, after Smith was to stop using the Lawn Managers name, Lawn Managers registered the word mark "Lawn Managers" with the U.S. Patent and Trademark Office. Later that year, Lawn Managers sent Progressive a letter stating that it considered Progressive's logo to infringe on the Lawn Managers mark. Progressive did not make any changes to its logo.

B

Lawn Managers sued Progressive in February 2016, asserting one count of federal trademark infringement under the Lanham Act, see 15 U.S.C. § 1114, and seeking injunctive and monetary relief. Progressive counterclaimed, asserting one count of cancellation of the trademark registration by virtue of "naked licensing." As relevant here, Progressive also raised the affirmative defense of unclean hands.

After a bench trial, the district court entered judgment in favor of Lawn Managers. The court found that through the licensing agreement, Zweifel had granted a license to Smith to use the Lawn Managers trademark, and that the license had not been a naked license. Next, it found that Progressive had infringed on the Lawn Managers mark after the expiration of the license on December 31, 2014. As relevant here, the court found that Progressive continued to use the mark in commerce after that date without consent and, that between 2012 and 2015, there was "constant and obvious consumer confusion, due to the post-divorce proceedings and the

-4-

resulting . . . license agreement." And the district court found that after the expiration of the license, "[Progressive] did not make a good-faith effort to dissipate confusion, but acted to deliberately exacerbate any consumer confusion with the intent of profiting from [Lawn Managers'] accrued consumer goodwill for as long as possible."

The district court entered an injunction and awarded Lawn Managers damages of $80,688—comprising a percentage of Progressive's profits during the relevant time period—and $71,346 for corrective advertising. In calculating its damages award, the court rejected Progressive's unclean hands defense. In a post-trial order, the court also awarded Lawn Managers $138,925 in attorney's fees.

## II

On appeal, Progressive does not contest the district court's finding of infringement. But it argues that the issue should not have been reached because Zweifel granted a naked license to Smith, resulting in the abandonment of the Lawn Managers mark. In the alternative, Progressive argues that the district court improperly rejected its unclean hands defense and abused its discretion in its award of damages. After a bench trial, we review the district court's legal conclusions de novo and its factual findings for clear error. Urban Hotel Dev. Co., Inc. v. President Dev. Grp., L.C., 535 F.3d 874, 879 (8th Cir. 2008).

## A

"As a general matter, trademark owners have a duty to control the quality of their trademarks." FreecycleSunnyvale v. Freecycle Network, 626 F.3d 509, 515 (9th Cir. 2010). "The purpose of the quality-control requirement is to prevent the public

deception that would ensue from variant quality standards under the same mark . . . ."[2] Taco Cabana Int'l, Inc. v. Two Pesos, Inc., 932 F.2d 1113, 1121 (5th Cir. 1991), aff'd on other grounds sub nom. Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763 (1992); see, e.g., Syntex Labs., Inc. v. Norwich Pharmacal Co., 315 F. Supp. 45, 56 (S.D.N.Y. 1970) (emphasizing that "the purpose of the control requirement is to avoid the danger that the public may be deceived *as to the quality* of a product sold under a recognized name" (emphasis added)), aff'd, 437 F.2d 566 (2d Cir. 1971). Naked licensing occurs when a trademark owner licenses a mark without exercising sufficient quality control over the services provided under the mark. See, e.g., Stanfield v. Osborne Indus., Inc., 52 F.3d 867, 871 (10th Cir. 1995), abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118 (2014); FreecycleSunnyvale, 626 F.3d at 515–16. "[Naked licensing] is inherently deceptive and constitutes abandonment of any rights to the trademark by the licensor." Stanfield, 52 F.3d at 871 (cleaned up).

To succeed on a claim of naked licensing, a party must establish that the licensor did not retain sufficient control over its licensee to guarantee consistent quality of the services provided under the mark. See, e.g., id. Because a finding of naked licensing results in involuntary trademark abandonment and the forfeiture of trademark rights, the party claiming insufficient control must prove it by clear and convincing evidence. See Cmty. of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church, 634 F.3d 1005, 1010 (8th Cir. 2011). This is a "stringent standard." Taco Cabana, 932 F.2d at 1121; see also, e.g., Ky. Fried Chicken Corp. v. Diversified Packaging Corp., 549 F.2d 368, 387 (5th Cir. 1977). Determining "whether the control exercised by the licensor is sufficient under the circumstances to satisfy the public's expectation of quality assurance arising from

---

[2]Notably, "'quality control' does not necessarily mean that the licensed goods or services must be of 'high' quality, but merely of equal quality, whether that quality is high, low or middle." Barcamerica Int'l USA Tr. v. Tyfield Imps., Inc., 289 F.3d 589, 598 (9th Cir. 2002) (cleaned up).

-6-

the presence of the trademark on the licensee's goods or services" is a fact-specific inquiry, as "[t]he standard of quality control and the degree of necessary inspection and policing by the licensor will vary with the wide range of licensing situations in use in the modern marketplace." 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 18:55 (5th ed. 2017) [hereinafter McCarthy] (cleaned up); see, e.g., Eva's Bridal Ltd. v. Halanick Enters., Inc., 639 F.3d 788, 790–91 (7th Cir. 2011) (explaining that how much control is "enough can't be answered generally; the nature of the business, and customers' expectations, both matter").

To determine whether a licensor exercises sufficient control, and so may enforce the terms of the trademark's use, courts evaluate whether the licensor "(1) retained contractual rights to control the quality of the use of its trademark; (2) actually controlled the quality of the trademark's use; or (3) reasonably relied on [the licensee] to maintain the quality." FreecycleSunnyvale, 626 F.3d at 512 n.1; accord Stanfield, 52 F.3d at 871–72 (applying the same factors). The district court found, and the parties do not dispute, that the licensing agreement in this case contained no express contractual right of control and that there was no evidence of actual control by Lawn Managers. This appeal therefore turns on whether, as the district court found was the case here, the licensor could reasonably rely on the licensee to maintain the quality of the services sold under the licensor's mark.

Courts have found that a licensor may reasonably rely on a licensee for quality control where the parties have enjoyed a long-term professional association, often termed a "special relationship." See 3 McCarthy § 18:57. In finding reasonable reliance, these courts have also stressed the lack of evidence showing deviant quality in the products or services provided by the licensee. For example, in Land O'Lakes Creameries, Inc. v. Oconomowoc Canning Co., the Seventh Circuit rejected a naked licensing claim where the licensor and licensee enjoyed a 40-year relationship and there had been "no complaints about the quality of the goods" during that time. 330 F.2d 667, 670 (7th Cir. 1964). Likewise, in Taco Cabana, the Fifth Circuit rejected

a naked licensing claim against two brothers who had cross-licensed their trade dress to one another for use in separate restaurants, but whose licensing agreement did not include any formal provisions establishing quality control. 932 F.3d at 1121. The court held that the brothers could reasonably rely on each other to maintain consistent quality because they had enjoyed a close working relationship for eight years and were intimately familiar with the standards and procedures necessary to ensure consistent quality. Id. at 1121–22. Similarly, in Transgo, Inc. v. Ajac Transmission Parts Corp., the Ninth Circuit rejected an abandonment claim against a licensor, finding adequate control where the licensor had a relationship with the licensee going back ten years, manufactured 90% of components sold by the licensee, and "believed that [licensee] was second only to [the licensor] himself in overall knowledge and ability in product development for th[e] market." 768 F.2d 1001, 1017–18 (9th Cir. 1985).

On this record, we agree with the district court that Progressive has not met its high burden of proving that Lawn Managers abandoned its mark through naked licensing. The district court properly found that Zweifel could reasonably rely on Smith's own quality control efforts and thus met the duty of control as licensor.

Of crucial importance in this case are the unique circumstances surrounding the licensing agreement. The licensing agreement was the result of a divorce and provided that Zweifel and Smith would, in effect, operate parallel, almost identical companies using the same name[3] and similar equipment and vehicles but in different zip codes. The licensing agreement split property, such as trucks and various lawn equipment, between Lawn Managers and Progressive. Among other things, it also provided that Smith could use Lawn Managers' credit to purchase equipment for her new business. In essence, then, the licensing agreement provided that Zweifel and

---

[3]Smith was to use Progressive Lawn Managers, doing business as Lawn Managers.

-8-

Smith would operate virtually the same business for a fixed period of time, or as Progressive asserts on appeal, that Progressive would "impersonate" Lawn Managers for the duration of the license period. After the licensing period terminated, so too did Smith's permission to use the name Lawn Managers.

These terms, combined with the couple's successful operation of the Lawn Managers business for over 17 years and the lack of any evidence of quality deviations at Progressive, are sufficient to support the district court's finding of reasonable reliance. It is reasonable to expect that Smith was familiar with the standards and procedures used to control quality at Lawn Managers, and that she would use those same standards and procedures at Progressive for the specified period after the divorce. Indeed, as the district court found, "[t]he work crews employed by [Progressive] had previously been employed by [Lawn Managers] and made use of the same procedures and equipment they had always used." The carryover of workers from Lawn Managers to Progressive indicated a continuity of services, and there is no evidence in the record that the services provided by Progressive differed in quality from those provided by Lawn Managers. To the contrary, Lawn Manager's crews "observed the work being done by [Progressive's] crews and observed and reported that the work [they] performed . . . was consistent with [Lawn Managers'] standards." Under these circumstances, "we would depart from the purpose of the law to find an abandonment simply for want of all the inspection and control formalities" appropriate in cases involving more formal licensing transactions. Taco Cabana, 932 F.2d at 1121.

Further, the district court's findings of fact and conclusions of law paint a picture of Smith, at Progressive, doing her best to emulate Zweifel and Lawn Managers. Smith used an advertisement video on her website that described Progressive as having been in business for a number of years. This was not true, but the statement is evidence that Progressive intended to hold itself out as Lawn Managers and to advertise the same quality of services that Lawn Managers had

always provided. Moreover, Smith was operating Progressive in the same geographic area as Lawn Managers, and Lawn Manager employees were in a position to observe that Progressive's work was consistent with Lawn Managers' standards. Lawn Managers could reasonably rely on Smith's quality control efforts and conclude that the services offered by Progressive were "of equal quality." Barcamerica, 289 F.3d at 598.

This conclusion aligns with the consensus of our sister circuits. A licensor's confidence in the licensee's ability to maintain quality, without more, may not be sufficient to show reasonable reliance.[4] But courts have consistently concluded that a "special relationship" can confer adequate quality control. Stanfield 52 F.3d at 867 ("In cases in which courts have found that a licensor justifiably relied on a licensee to quality control, some special relationship existed between the parties. . . . [In this case] in contrast, the relationship . . . was neither close nor successful."). Accord FreecycleSunnyvale, 626 F.3d at 518 (citing Barcamerica, 289 F.3d at 597); Land O'Lakes, 330 F.2d 667 (no naked license when company's name was on the label and there were no complaints about the quality of the goods during the forty years of the license agreement). Here, Zweifel and Smith had a long, close, and successful relationship operating Lawn Managers together. They were later bound by the MSA to continue operating parallel lawn care businesses for a comparatively short period of time after their divorce. The district court did not err in concluding that, under the circumstances, the "business relationship between Zweifel and Smith was more than sufficient to give [Lawn Managers] reasonable assurance of the quality of service [Progressive] would provide to customers."

---

[4]See, e.g., FreecycleSunnyvale, 626 F.3d at 519 ("Because sole reliance on a licensee's own control quality [sic] efforts is not enough to overcome a finding of naked licensing without other indicia of control, and because [the licensor] lacked a close working relationship with [the licensee] and failed to show any other indicia of actual control, we conclude that [the licensor] could not rely solely on [the licensee's] own quality control efforts." (internal citation omitted).

-10-

In urging us to reach a contrary conclusion, Progressive argues that Zweifel could not reasonably rely on Smith's own quality control efforts because his relationship with Smith was adversarial, as evidenced by the contempt proceedings in state court. But there is no evidence in the record that the *companies* Zweifel and Smith run—Lawn Managers and Progressive—were adversarial toward one another in ways that would affect the quality of the parties' lawn care services. Indeed, even though Zweifel testified that he was not in a position to ask Smith whether he could oversee the quality at Progressive—because they "were not talking at that time"—there is evidence in the record that others at Lawn Managers were keeping an eye on Progressive's work. Scott Hewett, Lawn Managers's general manager, testified that he had observed the quality of Progressive's work and concluded that "the lawns seemed good, they seemed fine." Zweifel and Smith's personal relationship, post-divorce, appears from the record to have been acrimonious. But this, standing alone, is not sufficient to conclude that Lawn Managers could not rely on Smith's business-related expertise and experience to maintain the quality of Progressives' lawn services during the life of the MSA-monitored license agreement.

In light of the particular facts and circumstances in this record, the district court did not err in finding that Progressive failed to meet its stringent burden of proving a naked license. See Barcamerica, 289 F.3d at 596.

B

Progressive next argues that the district court improperly denied its unclean hands defense. We review the district court's decision to deny an equitable defense for an abuse of discretion. Sturgis Motorcycle Rally, Inc. v. Rushmore Photo & Gifts, Inc., 908 F.3d 313, 343 (8th Cir. 2018); see Levi Strauss & Co. v. Shilon, 121 F.3d 1309, 1313 (9th Cir. 1997).

The defense of unclean hands may be invoked when the plaintiff has "engaged in 'willful act[s] concerning the cause of action which rightfully can be said to transgress equitable standards of conduct.'" Sturgis, 908 F.3d at 344 (alteration in original) (quoting Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 324 U.S. 806, 815 (1945)). Before the district court, Progressive argued that Lawn Managers had unclean hands because it sent a "We Want You Back" mailer in late July 2016 to approximately 2,000 of Progressive's customers. According to Progressive, the licensing agreement awarded these customer accounts to Smith in perpetuity, and Lawn Managers was prohibited from ever soliciting those customers. The district court rejected Progressive's assertion, concluding that the licensing agreement unambiguously provided that after July 25, 2016—when the parties' non-compete clause expired—Lawn Managers was entitled to renew advertising to all customers.

The district court's rejection of Progressive's unclean hands defense turns on the interpretation of the licensing agreement, which is an issue we review de novo. In re Fitzgerald Marine & Repair, Inc., 619 F.3d 851, 858 (8th Cir. 2010). Under Missouri law, which the parties agree applies here, "[t]he cardinal rule in the interpretation of a contract is to ascertain the intention of the parties and to give effect to that intention." J. E. Hathman, Inc. v. Sigma Alpha Epsilon Club, 491 S.W.2d 261, 264 (Mo. banc 1973). If the contract is unambiguous, "the intention of the parties is to be gathered from it and it alone." Id. "A contract is ambiguous only when it is reasonably susceptible of different constructions"; mere disagreement between the parties as to construction does not render the contract ambiguous. Id.

Like the district court, we conclude that there is no relevant ambiguity in the licensing agreement and that Lawn Managers was permitted to send the "We Want You Back" mailer in July 2016. The licensing agreement originally contained a non-solicitation clause in § 5.06 that was to be in effect for two years after the parties' divorce. This clause, however, was replaced entirely by a non-compete agreement

contained in the parties' July 25, 2014, Settlement Agreement. This non-compete agreement provides:

> [The p]arties agree that each of them <u>shall not</u> sign up or service any new residential accounts in the zip codes awarded to the other in the [licensing agreement]. This non compete agreement shall remain in effect for two years from today's date and is enacted in lieu of the prior non-solicitation clause found in [§] 5.06 of the [licensing agreement] . . . .

(Emphasis in original). By its plain language, then, the Settlement Agreement provided that the only restriction placed on Zweifel with respect to competition for customer accounts was that, through July 25, 2016, he could not "sign up or service any new residential accounts" in the zip codes encompassing the residential accounts that had been awarded to Smith in § 5.02. And there is nothing else in the licensing agreement that can reasonably be interpreted to place any other limits on the parties' solicitation of any accounts.

Progressive nevertheless argues that Lawn Managers could not solicit certain accounts even after July 25, 2016. Progressive's sole assertion is that the initial division of accounts in § 5.02 effectively gave Smith a perpetual property interest in certain customer accounts, and that those accounts thus remained off-limits to Zweifel forever. But § 5.02 merely divided the customer accounts of the pre-divorce Lawn Managers business. It states only that "[Smith] is awarded all right, title, and interest" in certain commercial accounts and that "[she] is awarded all right title, and interest in all residential accounts and accounts receivables of the corporation in the [listed] zip codes." By its plain language, this initial division of assets is wholly unrelated to restrictions on solicitation or competition.[5] And Progressive points to nothing in

---

[5]Progressive's contrary argument—to which it devotes much of its brief—that the accounts divided in § 5.02 constituted marital property and therefore could never be solicited again, misapprehends that this is a trademark infringement action in

the rest of the licensing agreement that prohibited the parties from eventually competing for the accounts initially divided up in § 5.02. "[A] court's duty is confined to the interpretation of the contract which the parties have made for themselves, . . . and a court may not read into a contract words which the contract does not contain." Textor Const., Inc. v. Forsyth R-III Sch. Dist., 60 S.W.3d 692, 698 (Mo. Ct. App. 2001) (cleaned up). Accordingly, the district court was within its discretion to conclude that the Lawn Managers mailer did not support Progressive's unclean hands defense.[6]

C

Progressive next argues that the district court clearly erred in awarding to Lawn Managers $80,688 of Progressive's profits—constituting 25% of Progressive's total profits during the relevant time period—and $71,346 for corrective advertising. "In a bench trial, ascertaining the plaintiff's damages is a form of factfinding that can be set aside only if clearly erroneous." Hall v. Gus Const. Co., 842 F.2d 1010, 1017 (8th Cir. 1988). Under that standard of review, we will reverse "only if we are 'left with the definite and firm conviction that a mistake has been committed.'" Id. at 1013 (quoting Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985)).

The district court did not clearly err in its damages award. In an action for trademark infringement, a plaintiff may recover, "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a); see Tonka Corp. v. Tonk-A-Phone, Inc., 805 F.2d 793, 794 (8th Cir. 1986).

---

federal court, and that its unclean hands defense turns on the language of the licensing agreement before us.

[6]Progressive also challenges the district court's finding that there was no other evidence in the record supporting its unclean hands defense. Based on our thorough review of the record, this finding is not clearly erroneous.

In awarding Lawn Managers $80,688 of Progressive's profits, the district court first found—based on expert reports and Progressive's tax returns and financial statements—that Progressive's total profits during the relevant time period were $322,753. On appeal, Progressive argues that the district court's starting point should have been lower, because, among other things, the parties were bound by a non-compete agreement for some months after the license expired. As a result, Progressive asserts, Lawn Managers did not lose any business due to the infringement during that period. But in a trademark case, the *defendant* bears the burden of proving any claimed deductions from total profits. See § 1117(a) ("In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed."); see also 5 McCarthy § 30:65 ("[I]t is the infringer's burden to prove any proportion of his total profits which may not have been due to use of the infringing mark."). And the district court found that Progressive had not submitted any credible evidence supporting its proposed reductions. Progressive points to nothing in the record that renders this finding clearly erroneous. But even more damaging to Progressive's position, in the end, is that the district court *did* consider Progressive's claimed causation problems. The district court awarded to Lawn Managers only 25% of Progressive's total profits, finding that an award in the full amount of $322,753 would be excessive for two reasons: (1) it was "difficult to trace causation from confused customers to an infringing act of [Progressive] instead of to [Lawn Managers'] two-year license"; and (2) from the expiration of the license on January 1, 2015, to July 25, 2016, the parties were under a non-compete agreement. The district court's reduction was within its power to consider equitable principles in awarding damages, see § 1117(a) (Lanham Act monetary remedies are "subject to the principles of equity"), and we find no clear error in the district court's award.

We reach a similar conclusion with respect to the court's corrective advertising award. Courts have approved monetary awards to plaintiffs for "corrective advertising" under the general rubric of "compensatory damages." See, e.g., Big O

-15-

Tire Dealers, Inc. v. Goodyear Tire & Rubber Co., 561 F.2d 1365, 1374–76 (10th Cir. 1977). "The purpose of general compensatory damages is to make the plaintiff whole." Id. at 1374. A trademark infringer "diminishes the value of plaintiff's trademark, and advertising restores that mark to its original value." Zazu Designs v. L'Oreal, S.A., 979 F.2d 499, 506 (7th Cir. 1992).

In its award for corrective advertising, the district court credited Lawn Managers' expert, economist Fernando Torres, who opined that "a reliable estimate of the cost of a corrective advertising campaign to redress [the wrongful marketing impressions created by Progressive's infringing conduct] . . . would be the cost of mailing a flyer" to households in the zip codes encompassing the accounts Smith was awarded in § 5.02 of the licensing agreement and that opened up to competitive activity after the expiration of the non-compete restriction in July 2016. According to Torres, the total cost for this corrective advertisement was $71,346. On appeal, Progressive argues that Torres's estimate was flawed because it did not explicitly consider how many of the households in those zip codes had ever seen Progressive's infringing advertisements or had ever used Progressive's services. Additionally, it argues, Torres "could not say" how many of these households had a yard or had ever seen a mailer in the past. But "[m]ere difficulty in calculating damages is not sufficient reason to deny relief, as we have repeatedly stressed that some uncertainty in damages should not work to bar a plaintiff from recovering from a proved wrongdoer." WWP, Inc. v. Wounded Warriors Family Support, Inc., 628 F.3d 1032, 1044 (8th Cir. 2011) (cleaned up). We find no clear error in the district court's award for corrective advertising.[7]

Accordingly, the judgment of the district court is affirmed.

---

[7]In a single footnote in its opening brief, Progressive asserts that the district court's award of attorney's fees in favor of Lawn Managers was improper. But because Progressive did not meaningfully argue this point in its opening brief, it has waived it. See, e.g., United States v. Stanko, 491 F.3d 408, 415 (8th Cir. 2007); Chay-Velasquez v. Ashcroft, 367 F.3d 751, 756 (8th Cir. 2004).

KOBES, Circuit Judge, dissenting.

No one thinks the Marital Separation Agreement (MSA) is a model trademark transaction. It emerged from a contentious divorce of two people who lived and worked side-by-side for more than 17 years. The MSA tried to walk a fine line by giving each spouse their sweat equity in Lawn Managers and preserving their livelihood. But the catch is that trademarks are also public rights. When the mark holder abuses the mark by deceiving the public, those rights are lost.

"A trademark carries with it a message that the trademark owner is controlling the nature and quality of the goods or services sold under the mark." 3 *McCarthy on Trademarks and Unfair Competition* § 18:48 (5th ed. 2017). The court holds that Zweifel/Lawn Managers did not grant a naked license because he could reasonably rely on his former spouse's (Smith/Progressive) quality control efforts. Zweifel admitted, though, that there was "no way possible" for him to control quality.

This extends the "reasonable reliance" doctrine too far. A close working relationship may substitute for formal controls, but a prior relationship is insufficient without some indicia of control. *FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509, 518–19 (9th Cir. 2010). This is the first time a court has approved a license without an *ongoing* relationship to monitor and prevent misleading uses of the mark. Our sister circuits have found that a licensor who does "not retain *any* control" has engaged in naked licensing and forfeited its rights. *Eva's Bridal Ltd. v. Halanick Enterprises, Inc.*, 639 F.3d 788, 791 (7th Cir. 2011) (emphasis in original); *Barcamerica Int'l USA Tr. v. Tyfield Importers, Inc.*, 289 F.3d 589, 597 (9th Cir. 2002) (naked licensing when licensor fails to "demonstrate[] any ongoing effort to monitor quality"); *Stanfield v. Osborne Indus., Inc.*, 52 F.3d 867, 872 (10th Cir. 1995) (naked licensing when parties have adversarial relationship during license). I would not break from this consensus.

Nor does licensee estoppel apply. Our precedent only bars a licensee from challenging the mark during the life of the license. Lawn Managers requests damages

for infringement after the license expired, and the license caused consumer confusion, so Progressive is not estopped from asserting a naked licensing defense.

I.

If a licensor that does not take reasonable steps "to prevent misuses of his trademark in the hands of others the public will be deprived of its most effective protection against misleading uses of a trademark." *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 367 (2d Cir. 1959). Although the court's decision accurately recites the applicable standards, it concludes that a licensor has sufficient control by having none at all. This fails to protect the public from naked licensing—a practice that "is *inherently deceptive* and constitutes abandonment of any rights to the trademark by the licensor." *Barcamerica*, 289 F.3d at 598 (citation omitted).

The cases the court relies on all show some form of licensor control. None hold that a defunct, adversarial business relationship is sufficient. The mark holder in *Transgo* made 90% of the components in the trademarked "Shift Kits," and therefore relied on its "own quality control procedures at its plant." *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1017 (9th Cir. 1985). Further, the mark holder and the licensee conferred on modifications to existing parts and the development of new products to be sold under the trademark. *Id.* In *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113 (5th Cir. 1991), a jury found "Taco Cabana exercises adequate supervision and control over TaCasita." 932 F.2d at 1117. Although it opined that the "purpose of the quality-control requirement" is quality not policing, the Fifth Circuit acknowledged "record evidence of at least some bilateral quality monitoring." *Id*. at 1121.

The Seventh Circuit has found reasonable reliance when the licensor appeared on the label and the long history without complaints. *Land O'Lakes Creameries, Inc. v. Oconomowoc Canning Co.*, 330 F.2d 667, 670 (7th Cir. 1964). But the district court earlier found that the licensor had "retained the right of supervision over all labels and products bearing the mark." *Land O'Lakes Creameries, Inc. v.*

*Oconomowoc Canning Co.*, 221 F. Supp. 576, 581 (E.D. Wis. 1963). The district court held that the "practice of the parties and the contract conditions render the license arrangement more than a naked license." *Id.*

Taken together, the cases cited by the court allow reasonable reliance through a "special relationship" when the mark holder had some control over the products. Here, the court holds that a "special relationship" alone confers adequate quality control. Maj. Op. 10. And the court does not acknowledge the further step it takes today: allowing a licensor to rely on the licensee because of a past relationship that has gone bad.

The court finds that Zweifel could reasonably rely on Smith because the license ensured that they "would operate the same business for a fixed period of time." Maj. Op. 8. This is besides the point because Zweifel did not retain "the right to control the nature and quality of defendant's use of the mark." *Lawn Managers, Inc. v. Progressive Lawn Managers, Inc.*, 390 F. Supp. 3d 975, 982 (E.D. Mo. 2018). The three-sentence license merely permitted Progressive to "do[] business as Lawn Managers" and allowed Smith to "use the name Lawn Managers for" two years after the divorce. Add. 15–16. It did not limit or guide Progessive's choices in offering services, training employees, purchasing equipment, or adhering to quality standards.

The court also holds that Progressive "has not met its high burden" to prove naked licensing by overlooking key evidence. Maj. Op. 6. When asked whether he had approached Smith (or anyone at Progressive) about the quality of their services, Zweifel testified, "No. We were not talking at that time. There was *no way possible* to approach her like that." D. Ct. Dkt. 109, 10/30/17 Tr. 115:23–116:3 (emphasis added). Zweifel claimed, by "looking at her most recent website," that Smith "offers the exact same" treatments. *Id.* at 76:2–5. Smith, however, explained that "I change my product and my applying at different times per what we're learning every year." D. Ct. Dkt. 110, 10/31/17 Tr. 125:19–126:1. Lawn Managers's general manager, Scott Hewett, testified that although he had observed lawns Progressive had serviced,

he stopped supervising Progressive employees "right at the time of the separation." *Id.* at 41:22–42:3. There is no evidence that Lawn Managers "made any effort to supervise defendant's work." *Lawn Managers*, 390 F. Supp. 3d at 983. Progressive did more than show Lawn Managers's lacked sufficient control, it proved the "extreme case" where the licensor had none. *Eva's Bridal Ltd.*, 639 F.3d at 791.

Trying to show evidence of some oversight, the court notes that "others at Lawn Managers were keeping an eye on Progressive's work." Maj. Op. 12. Yet it cites no case where casual observation, without an ongoing relationship, is sufficient to permit the mark holder to reasonably rely on the licensee. And in *Barcamerica*, the court rejected the mark holder's assertion of quality control through informal wine tastings. 289 F.3d at 598. "What matters is that [the mark holder] played no meaningful role in holding the [product] to a standard of quality." *Id.*

As a result, the court approves a license that caused "constant and obvious consumer confusion." *Lawn Managers*, 390 F. Supp. 3d at 979. Customers were dumbfounded when they were told that Lawn Managers "can't service your ZIP Code" as "Lawn Managers" trucks drove through their neighborhood. *Id.* And more "confusion manifested itself in phone calls to one party meant for the other party and checks that had to be hand-sorted to make sure they went to the correct company." *Id.* Progressive impersonating Lawn Managers without any guarantee that the goods and services were the same is the very harm to the public that trademarks seek to prevent. Because the license deceived the public Lawn Managers forfeits the mark.

## II.

The court's decision is also hard to square with those of our sister circuits that require the mark holder to show some indicia of control and oversight through an ongoing relationship. The court does not dispute that Zweifel had no relationship with Smith after the divorce and any oversight was limited to casual observation. I cannot agree that a licensor who admitted he did not talk to the licensee somehow

-20-

*maintained* a special relationship that permits a court to infer an indicia of control over quality.

The Seventh Circuit rejected a similar licensing scheme in *Eva's Bridal*. There, a family-owned dress shop licensed its name to the owner's siblings after the siblings purchased a location that they had operated for eight years. *Eva's Bridal Ltd. v. Halanick Enterprises, Inc.*, No. 07 C 1668, 2010 WL 9921849 *2 (N.D. Ill. Aug. 4, 2010). The relevant agreement only required payment of $75,000 per year to use the "Eva's Bridal" name and marks. *Eva's Bridal Ltd.*, 639 F.3d at 789. After the agreement expired, the siblings stopped paying the royalty but continued using the mark. *Id.* The mark holders brought an infringement action five years later. The district court dismissed the suit because it held that plaintiffs had abandoned the mark by granting a naked license. *Id.* Specifically, it found that the agreement had no quality control provisions and that plaintiffs had "never tried to control any aspect of how defendants' shop operated or how the mark was used." *Id.* at 790.

The Seventh Circuit affirmed, explaining that the "supervision required for a trademark license is the sort that produces *consistent* quality." *Id.* (emphasis in original). Although the amount of control is a factual question, the Seventh Circuit found that it was unnecessary to decide that "because plaintiffs did not retain *any* control—not via the license agreement, not via course of performance." *Id.* at 790–91 (emphasis in original). It was the "paradigm of a naked license" because the mark holder had "*no* authority over the appearance and operations of defendants' business, or even over what inventory to carry or avoid." *Id.* at 791 (emphasis in original).

The Ninth and Tenth Circuits have also required an indicia of control without an ongoing relationship. *Barcamerica*, 289 F.3d at 596; *Stanfield*, 52 F.3d at 872. In *Stanfield*, an inventor of a fiberglass heating pad for newborn hogs received royalties from the manufacturer and later sold the rights to use "Stanfield" for 15 years. 52 F.3d at 869. Shortly after signing the licensing agreement, the inventor resigned from the company and had no contact with it except for litigation over

-21-

royalty payments and the trademark. *Id.* at 870. The Tenth Circuit affirmed the district court's naked license finding because there was no express quality control provision or actual control and the only relationship between the parties existed in court.[8] *Id.* at 871–72.

Likewise, the Ninth Circuit rejected a vineyard's licensing scheme where the "sole evidence" of the mark holder's quality control was random wine tastings and reliance on the licensee's reputation. *Barcamerica*, 289 F.3d at 596. Even though the wine tastings "perhaps demonstrate a minimal effort to monitor quality," *id.* at 597, the Ninth Circuit expected the mark holder "to sample (or to have some designated wine connoisseur sample) on an annual basis, in some organized way, some adequate number of bottles of the Renaissance wines which were to bear Barcamerica's mark to ensure that they were of sufficient quality," *id.* at 598. It held that a mark holder with no "involvement whatsoever regarding the quality of the wine and maintaining it at any level" engages in naked licensing. *Id.* at 597. As the court points out, the Ninth Circuit's decision in *FreecycleSunnyvale* prohibited the licensor to rely on the licensee because there was no close working relationship (and never had been) and the licensor failed to show any other indicia of actual control. Maj. Op. 10 n.4. The Ninth Circuit explained that "[o]ther circuits have also relied on the licensor's confidence in the licensee only where there were additional indicia of control." 626 F.3d at 519 n.7. I agree with our sister circuits and would require Lawn Managers to show some indicia of control.

---

[8] The court notes that Lawn Managers and Progressive (the companies vis à vis Zweifel and Smith) were not "adversarial in ways that would affect the quality of the parties' lawn care services." Maj. Op. 11. But the Tenth Circuit did not find an adversarial relationship because the quality of the pig heating pads had suffered. The relationship was adversarial because the parties had no working relationship and a history of lawsuits. *Stanfield*, 52 F.3d at 871–72. Here, there was no working relationship and the contempt lawsuits centered on Lawn Managers violating the MSA by competing for Progressive's clients. *See* Maj. Op. 11–13.

-22-

## III.

Because the mark has been abandoned due to naked licensing, I also address the claim that licensee estoppel bars Progressive's naked licensing defense. Lawn Managers argues that "a plaintiff-licensee is estopped from contesting the validity of its licensor's marks," citing *Seven Up Bottling Company v. Seven Up Co.*, 561 F.2d 1275 (8th Cir. 1977) (citing *Heaton Distrib. Co. v. Union Tank Car Co.*, 387 F.2d 477, 482 (8th Cir. 1967)). This court has been reluctant to apply licensee estoppel broadly. "Licensee estoppel precludes only licensees of a mark from contesting it," *Sturgis Motorcycle Rally*, 908 F.3d 313, 321, (8th Cir. 2018), and "covers only the mark that the licensee has agreed to use," *id.* at 322. I would follow this narrow view of estoppel.

Our precedent establishes only that a current licensee cannot challenge the validity of a mark during the life of the license. In *Seven Up*, we explained that "the establishment of an existing licensor-licensee relationship between [licensor] and [licensee] effectively constitutes an insuperable bar to recovery by [licensee] with regard to its trademark claims." 561 F.2d at 1279. But there, the licensee " ha[d] established the existence of a *present* and valid licensing agreement between plaintiff and defendant." *Id.* (emphasis added). Nor does the *Heaton* decision's statement that a licensee "would be estopped to claim" a mark is invalid bind us. 387 F.2d at 482. There, the court merely enforced a no-contest provision against a licensee. *Id.* The court had no occasion to decide if licensee estoppel applied "in the absence of" that provision. *Id.* As a result, the estoppel statement is "unnecessary to the decision in the case and therefore not precedential."[9] *Shephard v. United States*, 735 F.3d 797, 798 (8th Cir. 2013).

---

[9] The court even stated that its entire discussion, including the estoppel statement, "is immaterial to the outcome of the case." *See id.* Accepting that as true, the statement is dicta.

As Progressive did not challenge the license's validity while using the mark, it is not barred from asserting a naked licensing defense to post-license infringement claims. This defense is not inconsistent with the license or Progressive's recognition that in 2012 the mark held significance. Progressive should be allowed to show that by 2015 there was no mark left to protect, and therefore, it cannot be liable for post-license infringement. Especially where the license caused consumer confusion, I would permit the licensee to assert a naked licensing defense against infringement claims arising after the license expired.[10]

\* \* \*

Trademark law imposes an affirmative duty on the licensor to police the goods and services offered to the public under its mark. A licensor cannot shirk this duty by relying on a past relationship with no way to control quality. Because I would not approve a trademark license that worked a fraud on the public, I respectfully dissent.

_____

---

[10] Some courts even hold that naked licensing estops the trademark owner from asserting rights to the mark. *Barcamerica*, 289 F.3d at 596 (9th Cir. 2002); *Sheila's Shine Prod., Inc. v. Sheila Shine, Inc.*, 486 F.2d 114, 124 (5th Cir. 1973).